**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

**UNITED STATES OF AMERICA**

**v.**

**Daniel Thomas Hersl**

**Criminal No. 1:17-cr-00106**

## MOTION TO VACATE, SETASIDE, OR CORRECT SENTENCE (28 U.S.C. § 2255)

NOW COMES, Daniel Thomas Hersl, (hereinafter "Hersl"), representing himself pro se and respectfully requesting the court to construe this motion liberally. Former Detective Hersl, employed at the time by the Baltimore Police Department (BPD), contends that he was falsely convicted of the crimes against him, including RICO conspiracy and racketeering along with Hobbs Act Robbery. Hersl claims his full innocence and in addition strongly believes he was set-up by person(s) motivated to harm him. Hersl further contends his rights to due process under the fifth and fourteenth amendments have been violated. Hersl also claims his fourth amendment due process rights relating to illegal searches and eighth amendment due process rights associated with cruel and unusual punishment have also been violated. In addition, a suspect prosecutorial investigation against Hersl ignored his safety in the work place thus secretly keeping him in imminent danger of death or serious harm. Such an action by the prosecutor and the Federal Bureau of Investigation (FBI) was unprofessional, unethical, and violated Maryland Labor and Employment Law as well as Hersl's fourteenth amendment right of equal protection under the law.

Hersl will present six (6) major circumstances that bear on the unfortunate injustice of his current legal situation. Within each major circumstance, Hersl will offer evidence and varying degrees of explanations associated with the wrongful conviction and set-up which will establish the grounds for this motion.

**The six major circumstances that contribute to Hersl's unjust conviction are:**

I. Prosecutorial/FBI assisted investigation was compromised and illegal

II. Indictment handed down from the grand jury is overwhelmingly suspect

III. Ineffective assistance from Counsel,

IV. Prosecutorial misconduct

V. Internal information leaks to the public from prosecutorial team

VI. Judicial interference

1

*American Bar Association (ABA) Standards*

Within this motion, Hersl references specific paragraphs from the ABA Standards for Criminal Justice as follows:

In sections I, IV & V of this motion, the *ABA Standards for Criminal Justice: Prosecutorial Investigations, 3rd Edition (2014)*, is referenced as an "objective standard of reasonableness" for prosecutorial conduct during a criminal investigation.

In proving ineffective assistance of Counsel in section III off this motion, Hersl references specific paragraphs from the *ABA Criminal Standards for the Defense Function, 4th Edition (2017)*, as an "objective standard of reasonableness" for defense representation.

*Warrant Documents*

The most difficult aspect of Hersl's legal matters has been his lack of access to discovery documents. Hersl will further explain this dilemma later in the motion. However, Hersl was able to obtain the warrant documents nearly three years after he was originally incarcerated. The importance of the documents is that the information they provide helps to show and explain Hersl's innocence as will be demonstrated in this 2255 motion. Hersl is in hopes that the court will understand the justice aspect of and the need for releasing all of the protected documents pertaining to his case.

Aside from scattered non-sequential tidbits of information obtained in different places and times, Hersl is unaware of the events that constituted the prosecutorial/FBI assisted investigation into the Gun Trace Task Force (GTTF). With assistance from his family, in the spring of 2020, Hersl obtained twenty-three (23) sets of warrant documents from two different locations on the federal court document website *Pacer*. Twenty three (23) of the sets are tied to the GTTF investigation and one (1) set is tied to the Antonio Shropshire (hereinafter Shropshire) Drug Trafficking Organization ( DTO) investigation. Hersl is unsure that he is in possession of all warrant documents pertaining to his case.

The GTTF warrant documents were protected (court sealed) and became unprotected through the efforts of the *Baltimore Sunpapers* in August thru November 2018. The *Sunpapers* received one set of Shropshire DTO protected warrant documents from the prosecutor in November 2019. From the warrant documents, Hersl is able to analysis and piece together, for the first time, the relevant facts

2

contained in sequential warrant applications which reveal: an investigation timeline; investigation focus; investigator inferences and/or conclusions; and, probable cause statements. The warrant timeline and table are attached as EXHIBIT A.

### *Open Letters to the Maryland State Commission to Restore Trust in Policing*
In an effort to help the public better understand his story behind the GTTF and BPD, Hersl has written an on-going array of twenty four (24) open letters to the Commission about his experience as a career police officer. Hersl is in hopes that by sharing his experience, he will be doing his share to help guide decision makers in planning a better future for law enforcement. Hersl is also in hopes that in the end with a diligent investigation by the Commission the truth will prevail as well as his innocence. Hersl plans to continue with the open letters in between solving his legal matters, this 2255 motion being one of them. In part, Hersl references the letters in this motion (EXHIBIT B).

## I. Prosecutorial/FBI Assisted Investigation Was Compromised and Illegal
### *Investigation plagued by manipulation of warrant applications; lack of full disclosure by affiants; inside information leaks to the public; and, illegal activity*

### *Investigation Background*
Local Baltimore and Harford County investigators were probing into the Shropshire DTO since 2013 including a possible tie to Wayne Jenkins (hereinafter Jenkins), an officer with the BPD. Jenkins was not with the GTTF at the time but would become the Sergeant of the unit on June 13, 2016.

Almost immediately after the tragic death of Freddie Gray and during the GTTF federal investigation, U.S. Attorney General Loretta Lynch was taking a very public and active role in persuading Baltimore to enter into a consent decree with the Department of Justice (DOJ). In August 2015, the DOJ initiated a "14141" investigation also known as a "pattern or practice" investigation involving the BPD. AG Lynch made it a top priority to have the consent decree signed before President-elect Donald J. Trump's inauguration. The "pattern or practice" investigation was completed on August 10, 2016 and the consent decree was signed on January 12, 2017. (EXHIBIT C)

The Federal criminal investigation into the GTTF was initiated in late October 2015 as local investigators joined with the federal investigators to piece together the connection between Momado

Gondo (hereinafter Gondo), Jemal Rayam (hereinafter Rayam), and John Clewell (hereinafter Clewell) with the Shropshire DTO. Gondo, Rayam, and Clewell were all members of the GTTF and were targeted by investigators for their part in the armed robbery of Aaron Anderson's girlfriend on October 5, 2015. Anderson is a competitor of the Shropshire DTO in the illegal drug market. The robbery occurred in Anderson's apartment with the supplemental use of a GPS tracking device owned by Clewell.

On March 31, 2016, on a government tapped phone, Shropshire called Gondo asking for advice upon discovering a GPS tracking devise on his vehicle. Over a series of conversations, government investigators learned that Gondo gave Shropshire advice on getting rid of the GPS tracking device. Gondo had a close relationship with Kyle Wells (herein after Wells) and Shropshire. Wells is a member of the Shropshire DTO and a close personal friend of Gondo's from childhood.

The applications for early warrants, dated March 14 thru May 16, 2016, (See EXHIBIT A) regarding the GTTF investigation requested the use of pen registers and caller identification to gain phone data on Gondo, Rayam, Clewell, and Wells. The probable cause for the warrants is the association of all four individuals through their involvement with the Anderson robbery.

On May 27, 2016, federal investigators intercepted a phone call (hereinafter the May 27th phone conversation) between Gondo and Rayam where they describe Hersl as being a possible informant not to be trusted. The phone conversation was used by the FBI in the Shropshire DTO investigation as part of the application for warrant 16-mc-361, dated June 8, 2016. Due to the May 27th phone conversation, the FBI affiant described the situation of Hersl working closely with Gondo and Rayam as being dangerous – too dangerous to insert an undercover agent to work with Gondo and Rayam.

The warrant application for warrant 16-2035-ADC, dated June 8, 2016, firmly established Gondo's and Rayam's involvement with the Anderson robbery. Since ample money was deposited into Gondo's and Rayam's bank accounts and not Clewell's, investigators were interested in the historic phone records of all three dating back to 2013.

The warrant application for warrant 16-2035-ADC, dated August 10, 2016, establishes a "pattern" of illegal activity associated with the misuse of GPS tracking devices involving Gondo, Rayam,

4

Clewell, Wells, and Shropshire. Investigators were interested in the tracking data associated with the personal GPS tracking devices owned by Gondo and Clewell.

The warrant applications for warrants dated August 3 thru 26, 2016, mentioning the enforcement action at the Hamilton residence in Westminster entailed: the use of Gondo's personal GPS tracking devices in the Westminster case by Gondo, Rayam, and Jenkins; phone conversations between Gondo and Rayam revealing to investigators that Gondo and Rayam stole money from the Hamiltons; and Gondo depositing $8,000 in cash into his bank account on the Monday following the robbery of the Hamiltons on Friday.

### *Allegations Regarding GTTF Investigation*

Hersl contends that a compromised GTTF investigation led to his demise through "guilt by association". Hersl's involvement and participation in the GTTF was job related. In January 2016, Hersl unknowingly and involuntarily was assigned to a corrupt and dangerous internal police criminal conspiracy which was already in the midst of a federal investigation. Hersl's assignment came directly from Major Kevin Jones, Gondo and Rayam's former GTTF sergeant (Exhibit D). Being under BPD command and supervision, Hersl's work efforts were inescapable from the direct association with the GTTF and their hidden criminal actions. Hersl's employment demise was then ripe to be exploited by the prosecutorial/FBI assisted investigation of the GTTF.

It is appears that Hersl became a target of the GTTF investigation around August 31, 2016. From then on, the investigation into Hersl is riddled with invalid warrants & illegal searches; lack of full disclosure by affiants; inside information leaks to the public; and illegal activity

### A. Invalid Warrants & Illegal Searches

It is a American Bar Association (ABA) recommendation that the prosecutor make every effort to make fair and objective determinations that guard against the prosecution of the innocent (Std. 26-1.2 (c)(i)) and ensure against premature beliefs or conclusions  and be guided by the facts (Std. 26-1.2 (d). On warrant applications regarding Hersl, the prosecutor did neither.

The analysis of the warrant applications reveal that the GTTF investigation was manipulated and skewered in the following manners, with each manner being a ground for this motion:

> **GROUND 1**
> Warrant was issued with NO STATED BASIS for probable cause
> Violation: Illegal Search - Fourth Amendment violation
> Evidence: Warrant No: 16-641, dated August 31, 2016

The purpose of the warrant was to direct Verizon Wireless, a cellular service provider, to disclose certain records and information pertaining to Hersl's phone between January 1 and August 31, 2016. The intent of the warrant is stated on page 8 of the warrant application in numbered paragraph 29 and reads in part:

> "Investigators are attempting to uncover the full scope of the conspiracy as it relates to members of the GTTF and their involvement in the use of illegal tracking devices as well as their involvement in submitting false overtime hours."

The "probable cause" associated with the warrant is also summarized and stated on page 8 in numbered paragraph 29. The paragraph mentions the investigator's concern with Allers, Gondo, Rayam, Clewell, and Jenkins all having knowledge of the illegal use of GPS tracking devices. The basis of the concern was a recovered illegal tracking device owned by Clewell and used by Gondo and Rayam. In addition, various phone conversations between Gondo and Rayam on Gondo's government tapped phone referred to Allers and Jenkins having knowledge of illegal tracking devices being used.

In addition the paragraph states a specific concern with Jenkins approving false overtime reports for Ward, Hendrix, and Taylor. The basis of this concern is a July 1, 2016, phone conversation between Gondo and Rayam in which the government contends Gondo and Rayam discussed Ward, Hendrix, and Taylor committing "overtime fraud".

Warrant documents and the GTTF investigation up through August 31, 2016 are silent on any suspicion of criminal activity associated with Hersl. The subject warrant is the first GTTF

6

investigation warrant issued against Hersl. Within Warrant No: 16-641, Hersl's name is broadly mentioned twice, i.e. with his phone number and his unknown assignment date to the GTTF squad. Otherwise, Hersl's name does not appear in the warrant application within the relevant facts or the probable cause statement. There is no mention of Hersl being associated with illegal trackers and there is no mention of Hersl being associated with false overtime reports. All of the evidence available to the investigators at that time, including tapped phone conversations, location data, tracking company data, and review of overtime slips doesn't implicated Hersl in any suspicion of criminal activity.

In essence, the applicant had NO STATED BASIS, let alone a reasonable basis, of "probable cause" for searching Hersl's phone data. On this first search warrant against Hersl, he became "wrongfully associated" with other members of the GTTF and their alleged criminal behavior.

Warrant 16-641 is the "guilt by association warrant". Hersl believes that such prosecutorial neglect on this warrant coupled with a suspicious reassignment into the GTTF, which was already under investigation, is validation to being drawn into a set-up to go down with the squad.

Hersl contends that without a reasonable basis for probable cause, the warrant should be judged invalid and the carrying out of the signed warrant constituted an illegal search which violated Hersl's Fourth Amendment right.

The information obtained in Warrant No: 16-641, in addition to the information obtained in subsequent search warrants that relied on the phone data should be suppressed.

### GROUND 2

Warrant Affiliates Withheld Exculpatory Evidence from Court Authorities

Violation: Illegal Search - Fourth Amendment violation

Evidence: All GTTF warrants Against Hersl

Hersl is not privy to the recording and/or transcripts of the May 27, 2016, tapped phone conversation between Gondo and Rayam. However, according to trial transcripts of Rayam's testimony on page 101, there was a concern between Rayam and Gondo that Hersl may be an Internal Affairs Division

7

(IAD) informant. This phone conversation clearly shows how Hersl was not part of any illegal conspiracy involving Gondo and Rayam. The main characters of the GTTF conspiracy, Gondo and Rayam, didn't trust Hersl. They were not about to reveal to him any of their secret criminal activity or involve him in any planning of future criminal activity. The phone call and its contents are exculpatory evidence that should have been included in all warrant applications against Hersl in order to provide the deciding court-authority "totality of circumstances" when reviewing the probable cause statement for acceptance.

On all warrant applications brought before court authorities involving the GTTF investigation, the applicants and/or affiants always negated to inform the authorities of the May 27, 2016 phone conversation pertaining to Hersl. However, on the application for warrant 16mc361, dated June 8, 2016, involving the Shropshire DTO investigation (not the GTTF investigation), brought before Judge Richard D. Bennett, the affiant, FBI Special Agent Erica Jensen (hereinafter Jensen), specifically used the May 27, 2016 conversation on pages 39-40. Jensen argued that because Gondo and Rayam were suspicious of Hersl being an informant, they would be suspicious of any undercover agent the FBI would consider planting within the GTTF squad. Jensen's statement clearly shows investigators were: well aware of the phone conversation; Hersl's status as a non-conspirator; and were willing to use it in the warrant application process involving the Shropshire DTO investigation but not the GTTF investigation.

The applicants on warrant applications 16-641, dated August 31, 2016; 16-778, dated October 21, 2016; 16-2855 BPG, dated October 28, 2016;17-587 thru 0601-SAG, dated February 24, 2017; and 17-602-SAG, dated February 24, 2017 did not mention the May 27, 2016 phone conversation and therefore acted with reckless disregard for the truth. (United States v. Perkins, No. 15-30035 (9th Cir. 2017)). Thus, when reviewing the warrant applications, the court-authority was unaware of all relative facts when making the decision to grant or denied the warrant application.

Hersl contends that because the probable cause statement did not include exculpatory evidence that was material to the probable cause, the warrant should be judged invalid and the carrying out of the signed warrant constituted an illegal search which violated Hersl's Fourth Amendment right.

The information obtained by the prosecutor in all GTTF warrants against Hersl should be suppressed.

### GROUND 3

Affiliate Withheld Exculpatory Evidence; Made Unreasonable Assertions

Violation: Illegal Search - Fourth Amendment violation

Evidence: All warrants listed in EXHIBIT A, dated February 24, 2017

***Investigators Believe Gondo and Rayam Robbed the Hamiltons***

For nearly eight (8) months, July 2016 thru February 2017, investigators believed Gondo and Rayam robbed the Hamiltons. Starting with warrant 16-189, dated August 5, 2016 and prior to all warrants dated February 24, 2017, the relevant facts in the applications state that investigators believe, due to recorded phone conversations between Gondo and Rayam, on July 8, 2016, they secretly robbed the Hamilton's 1) at a 3 PM traffic stop; or 2) at their residence around 6 PM; and, then argued around 10:30 PM amongst themselves whether Gondo skimmed $3,000 of the robbery proceeds.

The relevant facts of the warrant application also state that Gondo and Rayam used Gondo's personal GPS tracking device to performed digital surveillance on the Hamiltons from June 9 thru July 8, 2016. Jenkins assisted with the surveillance from July 5th thru July 7th.

***Specific Hamilton Statements***

Sometime prior to February 24, 2017, investigators interviewed the Hamilton's. According to the application of warrant 17-189, dated February 24, 2017, Ronald Hamilton (hereinafter R. Hamilton) stated: Rayam took $3,400 from him at the 3 PM traffic stop and put it in his vest; Jenkins, Rayam, and Gondo asked R. Hamilton where he kept his money (Hersl was not included); the Hamiltons had two heat sealed bags up-stairs, one containing $50,000 and the other $20,000; Jenkins, Rayam, and Gondo went up-stairs to search for the money; and, Hersl remained in the living room with both Hamiltons and did not search for the money. These statements by R. Hamilton were specific in that he named individuals and did not vaguely refer to any of the individuals as the GTTF. These specific statements by the Hamiltons indicate that Hersl was not involved in robbing them.

***Non-specific Hamilton Statements***

Two statements made by the Hamiltons and reported by investigators are non-specific. One statement by R. Hamilton was that $20,000 in the heat sealed bag was stolen by the GTTF. The vagueness with

9

this statement is in the title "GTTF". Which individual members of the GTTF did R. Hamilton see take the money?

Another statement the Hamiltons made is that they believe $23,400 and two expensive watches were stolen from them by Jenkins, Rayam, Gondo and Hersl. The statement is filled with ambiguity. Did the Hamiltons believe the valuables were taken? Did they believe Jenkins, Rayam, Gondo and Hersl stole the valuables? Or both? Did the Hamiltons believe or were they certain? Were the Hamiltons thinking in unison or was the statement a collaboration of their thoughts?

The two non-specific statements were solely relied upon by investigators as a reasonable basis for probable cause with respect to the Hamilton robbery. One would have to question why the Hamiltons became non-specificity in their two statements. Were they uncertain?

More important, one would have to question why professional investigators would not require the Hamiltons to be specific in all of their statements or report the reasons for uncertainty. Why did the GTTF investigators let ambiguity become part of the basis for their probable cause statement?

### *What was not Said*
The Hamiltons did not see the $20,000 bag leave the house and either did Hersl since he was sitting with R. Hamilton at all times. The Hamiltons witnessed the $50,000 bag of money leave the house with the Maryland State Police (MSP) and N. Hamilton signed the seizure papers. Neither of the Hamiltons asked about the $20,000 bag.

Investigators knew the Hamiltons were not about to tell the MSP that they forgot to seize the $20,000 bag located up-stairs in hopes that the bag was overlooked. After all police vacated the premises, the Hamiltons searched the house for the $20,000 bag and after not finding it, they knew they were robbed; however, they did not know who robbed them. At that time even the MSP were suspect and R. Hamilton made the call to the MSP a few days later to find out.

### *The "Pattern"*
Investigators were always searching for the "pattern" of conduct that could be associated with the GTTF. The pattern of conduct emerged with the Hamilton robbery. The "pattern" is: While on the job

as a police officer, secretly plan to rob drug dealers by using confidential informants and personal GPS tracking devices for investigation and surveillance purposes. When the time is right, rob the drug dealers of money and drugs. The clincher for the "pattern" is the watches. Why were Gondo, Rayam and Jenkins obsessed with valuable watches?

The Anderson robbery on Marnat Road and the Hamilton robbery in Westminster were just what the investigators were looking for – the "pattern". However, Hersl was not involved with the Marnat Road robbery and there was no evidence that Hersl was involved with the Westminster robbery. The Hamiltons, contrary to what the warrant applications say were excellent witnesses. Their testimony, if understood, shows that Hersl did not rob them.

For nearly eight months, investigators believed Gondo and Rayam robbed the Hamiltons. For whatever reason on February 24, 2017, less than a week before Hersl's arrest, the investigators took a leap of faith; relied on two ambiguous statements by the Hamiltons; ignored the Gondo/Rayam phone conversations on the Hamilton robbery; ignored the May 27th Hersl's an informant phone conversation; ignored the specific parts of R. Hamilton's testimony; ignored the "pattern"; ignored that Gondo deposited $8,000 into his bank account and Rayam was gambling heavy; and, subjected Hersl to an illegal search due to an unreasonable basis for probable cause.

Hersl contends that without a reasonable basis for probable cause, the warrant should be judged invalid and the carrying out of the signed warrant constituted an illegal search which violated Hersl's Fourth Amendment right.

### B. Lack of Full Disclosure by Affiants

**GROUND 4**
Prosecutorial/FBI Assisted Investigators Employed by BPD – IAD Did Not Fully Disclose Their Crucial Knowledge and Experience That was Material Violation: Illegal Search - Fourth Amendment violation
Evidence: All warrant applications dealing with Time and Attendance Fraud

John V. Sieracki III, (hereinafter Sieracki), Matthew Smith (hereinafter Smith), and Jared Stern (hereinafter Stern) are employed by the BPD, assigned to IAD, and are members of the prosecutorial/FBI assisted GTTF investigative team led by prosecutor Leo Wise. Sieracki is an affiant and/or applicant on applications for GTTF warrants 16-3369-SAG and 17-587 thru 602-SAG; and, Smith on applications for GTTF warrants 16-778 and 16-2035-ADC. All three are knowledgeable about payroll policies and practices within the BPD and have first hand experiences. Since "time and attendance (T&A) fraud" is a charged offense in the investigation and since the traditional use of slash days and overtime (OT) were associated with the T&A fraud, their knowledge and experience on the matter are crucial and material to the decision making of the GTTF investigation team and the court authorities signing warrants.

Hersl, along with other members of the GTTF, has been accused of not working the hours he was paid for. Hersl contends that the hours, whether regular work hours or OT hours were worked except for paid leave hours that were given to Hersl and the squad by their supervisor. As a reward and compensation for the squad getting illegal guns off the streets in Baltimore City, the sergeant, at his discretion, gave members of the squad a few extra OT hours added to the officers pay and a "slash day". A slash day, known as a gun day, is a day paid day off from work. Hersl wrote open letters 008 thru 014 (EXHIBIT B) to the State Commission to Restore Trust in Policing explaining the reward and compensation practice used by the BPD as an incentive tool for getting illegal and dangerous guns off the streets. Under Jenkins, the GTTF sergeant, Hersl estimates about one hundred and fifty (150) illegal guns were seized by the squad of which he was personally responsible for about fifteen. Of course Hersl has no access to any gun records but all guns confiscated were duly submitted and recorded in multiple databases. The impact that the GTTF had on the homicide rate is quite dramatic as the squad was actively in operation for only about sixteen (16) weeks There is obviously a "quid pro quo" where OT and slash days were given to save lives (EXHIBIT E).

The Baltimore City Finance Department performed an audit and wrote a report titled "Report on *Overtime at the Baltimore Police Department*, dated October 24, 2018 (EXHIBIT F). A statement in the report is as follows:

> • Multiple commanders acknowledged the practice of awarding a paid day off without requiring an officer to work and without requiring use of an accrued leave day. Multiple commanders tried to justify the practice by arguing it was a necessary motivational tool

From the background experience that Sieracki provides as an affiant on warrant applications, Sieracki worked as a Patrol Officer on up to Sergeant in the BPD for about eighteen (18) years. Sieracki cleared a great deal of drugs and quite a few guns off the streets of Baltimore. In his career, Sieracki has made approximately 2,000 arrests.

Hersl's experience is very similar to Siewacki's in that Hersl, an officer working to rid the streets of drugs and guns, made about 1,800 arrest over seventeen (17) years. Both Sieracki and Hersl worked in the Operations Division of BPD sharing some of the same commanders and supervisors.

The OT and slash day practice is so widespread that even the BPD Director of Human Resources, Lieutenant Theodore Friel gave testimony at Hersl's and Taylor's trial that Friel gave out OT and slash days when he was a Sergeant in the Eastern District.

Because of Sieracki's experience and the well documented audit of BPD overtime, there is little doubt that Sieracki took part in the traditional BPD practice of receiving and doling out OT and slash days as an incentive for "going beyond the call of duty". Hersl finds it hard to believe that Sieracki does not know that the subject incentive practice of extra pay for "going beyond the call of duty" is a "quid pro quo" practice that is so well known and so widely used that it is not a fraud.

Smith's and Stern's experience with OT and slash days for reward and compensation is unknown.

In order to uphold the integrity of the legal system, Sieracki, Smith and Stern should have fully disclosed their knowledge and experience with the BPD payroll policies and practices, especially with regard to OT and slash days used as a motivational tool to reward and compensation.

By not disclosing, Sieracki, Smith, and Stern, withheld material information that was crucial to court authorities while making their decision to sign or not sign a search warrant.

Hersl contends that all warrants against him dealing with T&A fraud should be judged invalid and all associated searches illegal.

### C. Leaked investigation

*GTTF investigation was illegally communicated by IAD to outside source(s)*

#### GROUND 5

Investigative Team Member from IAD Leaked Information to the Public

Violation: Lack of Due Process Fifth and Fourteenth Amendment violation

Evidence: Confidential

(See Section V. Internal Information Leaks to the Public From Prosecutorial Team)

### D. Illegal Activity

#### GROUND 6

Prosecutorial Investigator Stayed Silent When Fellow

Law Enforcement Officer Was in Imminent Danger

Violation: Civil Rights Violated - Fourteenth Amendment Violation

Evidence: Tapped phone conversation (Gondo/Rayam May 27, 2016) and

Shropshire warrant application 16mc361, dated June 8, 2016, pg. 39-40

As mentioned in Shropshire DTO warrant application 16mc361, dated June 8, 2016, and under Ground 2 on pages 7 and 8 of this motion, FBI special agent Jensen reported that Hersl was working under dangerous conditions with Gondo and Rayam suspecting him of being an IAD informant. At this point in time, the investigation team had strong substantive evidence that Gondo and Rayam were involve with the Marnat Road armed robbery and the gun-toting Shropshire DTO. In other words, Gondo and Rayam were armed and dangerous.

In his open letters 016 and 017 (See EXHIBIT B), Hersl explains being in the Serpico situation with Gondo and Rayam. Jensen knew Gondo and Rayam were capable of inflicting serious physical harm on Hersl and even possibly death. Under Maryland Labor and Employment Code § 5-104, Hersl's employer was not providing Hersl with a place of employment that was safe and free from any recognized hazard that is likely to cause death or serious physical harm to the employee. Because Jensen knew Hersl was in imminent danger, she had a professional and moral obligation to report it.

Jensen did not recommend that an undercover agent be placed with Gondo and Rayam because it was too dangerous. However, well aware of Hersl being in a "Serpico" situation i.e. a clean cop working with dangerous dirty cops, Jensen stayed silent. She left Hersl, a fellow law enforcement officer, in a position of imminent danger. Jensen made a decision to ignore the Maryland Labor and Employment Law with respect to Hersl but recommended that another person be kept away from the same imminent danger. By doing so, Jensen violated Hersl's fourteenth amendment civil right of equal protection under the law.

Jensen made the decision to treat Hersl who was not a target but possibly under public surveillance differently than a normal citizen. In this situation, Jensen disregarded public interest and treated Hersl unfairly. She continued to keep silent, keep Hersl in harm's way, and thus kept treating Hersl unfairly throughout the investigation.

Since the investigation supported illegal activity and violated civil rights, Hersl request the Grand Jury indictment against him and his conviction be dismissed.

## II. Indictment Handed Down from the Grand Jury is Overwhelmingly Suspect

> **GROUND 6**
> Grand Jury Indictment is Overwhelmingly Suspect
> Violation: Right to a Grand Jury and Due Process Violated – Fifth and
> Fourteenth Amendment Violation
> Evidence: Lack of credibility and integrity in the investigation thus indicating
> prosecutorial misconduct carrying over into the Grand Jury hearings

Since the prosecutor and his investigative team:

withheld exculpatory evidence (May 27th phone conversation); carried forward ambiguous statements (Hamiltons); wrote warrant application with NO BASIS for probable cause ("guilt by association warrant"); did not disclose material knowledge and experience (OT, slash days and IAD officers); leaked information to the public (IAD officer); supported a crime by remained silent and violated civil rights;

the Grand Jury indictment against Hersl is suspect and Hersl request  the indictment and conviction
be dismissed.


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Due to the many difficulties associated with a coronavirus lockdown over the last seven (7) months at
the Springfield, Missouri MCFP Facility and the recent COVID-19 isolated quarantine of Daniel
Hersl, progress on developing this 2255 has been impacted.

Daniel's family partnered with him on preparing the 2255 and was impacted by the virus as well.

This 2255 motion is complete up and including Section II.

Sections III. thru VI. have gone thru the preliminary planning stage with some preliminary
development.  Further development and the final write-up await completion.

A request for time extension to complete this motion or file a "MOTION TO SUPPLEMENT THE
PREVIOUSLY FILED 28 U.S.C. 2255" will be submitted by separate cover

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


### III. Ineffective Assistance of Counsel

***Early Consultation***

Within reasonable probability, Hersl will explain how, the outcome of his trail would have been to
his favor if it were not for the ineffective assistance of Counel. (Strickland v. Washington, 466 U.S.
668 (1984))


Between the arrest date of March 1, 2016, and the tenth day of incarceration, court appointed lawyer
for Hersl, Peter Goldman, was unresponsive and failed to communicate with Hersl.  Defense Counsel
was then contracted by Hersl's family to represent Hersl in his criminal proceedings. The contract

was divided into pre-trial and a trial portions with each portion costing 50% of the contract fix fee. Expenses were addition cost. If a plea bargain was reached only the pre-trial portion of the fee would be billed.

Early on in the pre-trial stage, Hersl was adamant with his Defense Counsel on his innocence. Defense Counsel reviewed all initial evidence in his office away from Hersl who was incarcerated. Approximately in early April 2016, Defense Council than gave an overview of the evidence to Hersl and stated there is no evidence of criminal behavior that supports the indictment.

Near this time, Hersl and Defense Counsel realized that the prosecutor would be relying on the testimony of career drug dealers and cooperative co-defendants. Such testimonies were expected to be perjurous. In addition, Hersl agreed with Defense Counsel that the prosecutor over charged on the robberies mentioned in the indictment and at best they were thefts. Defense Counsel was also adamant that the gun charges, Hobbs Act and 924(c), which could carried hefty sentences, should be fought aggressively. Defense Counsel wasn't interested in pursuing the RICO Act or the wire fraud or the other robberies other than the Hamilton robbery which carried the gun charges.

## III a. Pre-Trial

### A. Discovery Documents Not Made Available for Ample Review and Analysis

**GROUND 7**
Defense Counsel Abandoned Right to Unprotected Rule16 Discovery
Violation: Ineffective Defense Counsel – Sixth Amendment violation
Evidence: Discovery Agreement

In March 2017, it is assumed that Defense Counsel entered into a signed "Discovery Agreement" with the prosecutor. Hersl's "Discovery Agreement" was not found in the case files which were returned to his family by Defense Counsel in the spring of 2020. Taylor's "Discovery Agreement (EXHIBIT G) is assumed to be the same as Hersl's.

In paragraph 6 of the agreement it states in part, ",,, counsel will not give copies of this material to the client or to anyone outside counsel's office, absent prior approval of this office. Counsel may of

course review this material with the client at any time or place …". The court did not issue a protective order for the discovery materials per Federal Rules of Criminal Procedure 16(d)(1).

Hersl was neither informed nor consented to the "Discovery Agreement" which essentially came with a protective order from the prosecutor and not the court. Hersl was informed by Counsel that the discovery materials were "protected" as if it was a court ruling which Hersl had no recourse to object. The agreement was detrimental to Hersl in that it denied him full access to the allegations of his accusers. Being denied access to Rule 16 discovery documents, Hersl was unable to fully absorb, take in, become familiar with, analyze the circumstances, and defend against all the accusations against him.

On January 8, 2018, the Jencks discovery material was ordered protected and went beyond a copy restriction to include a discussion restriction with individuals other than the defendant. The "Discovery Agreement" was used as justification in the prosecutor's motion. Taylor's lawyer opposed the motion, however to no avail. Hersl was never shown any Jencks material.

> **GROUND 8**
> Defense Counsel Did Not Invest the Time to Meaningfully
>  Review Discovery Documents with Hersl
> Violation: Ineffective Defense Counsel – Sixth Amendment violation
> Evidence: Lack of access to Discovery Documents

To this day Hersl lacks possession and complete knowledge of the vast majority of discovery material.

 In accordance with ABA Std. 4-1.3 (d) in part, Defense Counsel has a duty to communicate and keep the client informed. Hersl has intricate knowledge of the people, places, events, and history associated with the alleged crimes that he claims to be innocent of. When communicating with his lawyer about the crimes, generalities about the discovery documents were spoken about but there was no effort made for Hersl to review the discovery material in its whole and have the time to analysis it.

As show in section I. of the motion, many legal issues, previously unknown, were discovered by Hersl's meaningful review and analysis of the warrant documents. Hersl believes the warrant legal issues discovered would have put him in a better position to negotiate with the prosecutor dropping all charges involving T&A fraud and the Hamilton robbery. The warrant documents did not cover any of the other robberies and would have had not effect.

In all probability, if Hersl had access to all discovery material for review and analysis, additional legal issues, previously unknown would have made larger difference in the defense of T&A fraud and the Hamilton robberies in the trial. It would have also helped in defense of the other robberies.

It is impossible to specifically speculate how the pre-trial and trial would have been different because Hersl does not have the discovery documents, cannot review and analyze them and therefore does not know what legal issues would be brought out.

### B. Defense Counsel Was Ineffective in Protecting Hersl Against "Guilt by Association"

;

#### GROUND 9
Defense Counsel Did Not Defend Against "Guilt by Association"
Violation: Ineffective Defense Counsel – Sixth Amendment violation
Evidence: Trial Transcripts


Defense Counsel was ineffective in keeping the facts of the case tainted by a "Guilt by Association" strategically used by the prosecutor.

Continuously, during the pre-trial, trial, and post trial periods, Hersl was constantly associated with the alleged criminal activities of:

a. the overall GTTF
b. Sgt. Wayne Jenkins
c. Trial codefendant Taylor

Defense Counsel did not address the "Guilt by Association Warrant", 16-641,dated August 31, 2016.

19

No objection was made and no motion made to severe Hersl from the "Guilt by Association" strategy so that Hersl could have a separate, independent, and equitable ("more fair") trial.

### C. Proffer Sessions Influenced by Narcotics and Solitary Confinement

#### GROUND 10

Defense Counsel Permitted Torture

Violation: Ineffective Defense Counsel – Sixth Amendment violation

  Cruel and Unusual Punishment – Eight Amendment Violation

Evidence: Correction Facility Records; 302's

#### GROUND 11

Defense Counsel Permitted Interviews Under the Influence of Narcotics

Violation: Ineffective Defense Counsel – Sixth Amendment violation

  Cruel and Unusual Punishment – Eight Amendment Violation

Evidence: Correction Facility Records; 302's

### D. Failed to Fully Analysis GTTF Investigation

#### GROUND 12

Defense Counsel Ineffective in Conducting Full Investigation

Violation: Ineffective Defense Counsel – Sixth Amendment violation

Evidence: Section I. of this Motion

Of the seven charges of robbery/extortion in the first indictment, four (4) were improperly and/or poorly investigated by the Government and subsequently dropped. Of the three (3) remaining robbery/extortion charges, only one (1) was associated with the Gun Trace Task Force (GTTF). Such data would lead one to question the authenticity of the Government's investigation into the GTTF.

20

The Defendant indeed questioned his Counsel, "How did the Government ever come up with probable cause to ping my phone?" And, "If the Government thought that I was part of a GTTF or BPD Conspiracy Group, then why didn't they tap my phone conversations and/or wire my police vehicle?"

Although Counsel supposedly had possession of the Government's probable cause statements and warrant applications, the Defendant never saw the documents, was not informed about their contents , nor were they ever discussed. The documents were sealed by the Court for the protection of trial witnesses and police officers cooperating in the ongoing police corruption investigation. Nevertheless, after the trial, the *Sunpapers* was granted access to the documents but the Defendant wasn't.  The Defendant's family was able to download the newly unprotected documents from the *Sunpapers* case on the Government online document website called *Pacer* and send the documents to the defendant.

The documents provide information into the sequence of investigation events and information relied upon for a judge to grant a warrant.

The documents show that warrants were granted based off of flagrantly biased affidavits. In the Hamilton Robbery of July 8, 2016 (Hersl was part of a corrupt police conspiracy when a recorded phone conversation of May 28, 2016, told otherwise). Also, the grand jury was given false testimony based on an inappropriate  Government investigation.

### E.  Counsel Ineffective in Fully Planning to Defending All Charges

#### GROUND 13
Defense Counsel Did Not Fully Plan to Defend All Charges
Violation: Ineffective Defense Counsel – Sixth Amendment violation
Evidence: Trial Transcripts

Defense Counsel concentrated the legal defense on the Hamilton robbery and the associated gun charges.

### F.  Failed to Subpoena/Prepare/Utilize Key Defense Witnesses

> **GROUND 14**
> Defense Counsel Ineffective in the Use of Defense Witnesses
> Violation: Ineffective Defense Counsel – Sixth Amendment violation
> Evidence: Section I. of this Motion

### G.  Failed to share trial strategy with client

## III b. Trial

### A.  Poisoned the Jury

During court proceedings, including the opening and closing statement, Counsel commented that the Defendant admitted to taking money as an act of theft.  This statement is false, and was stated without the written or verbal consent of the Defendant. The Defendant did not admit to taking money from any of the victims portrayed in the trial. Such a statement by Counsel caught the Defendant off guard and at the same time created a damaging perception inside the courtroom that "The Defendant steals money". Whatever Counsel's reason for making the statement, it was ineffective as it "poisoned" the minds of jurors thus having a plausible effect on the trial outcome.

**Chronology of Events**

Very early on in the case, preliminary conversations between Counsel and Defendant involved discussions on how the original indictment of February 23, 2016, overcharged on seven (7) overt acts the government termed robbery/extortion. Counsel and Defendant agreed that the subject overt acts should be termed theft instead of robbery. Such an argument would be appropriate since the Defendant was accused of taking money AFTER it had been legally seized as part of a legal gun

and/or drug arrest. A charge of theft would deny the prosecutor a predicate crime in its RICO case, thus taking the conspiracy and racketing case out of Federal Court and placing it in the State Court as a theft case.

The first meeting with the prosecutor occurred on April xx, 2017, at Allegany County Detention Center. The Defendant was told by Counsel that the gathering would be a meet & greet. However, at the start of the meeting, Mr. Leo Wise, one of the prosecutors, became visibly upset argued with Counsel that the meeting was a proffer and not a meet & greet. The session became a proffer which the Defendant has a poor recollection of the details due to severe illness, including whether he signed a proffer agreement. The Defendant does recall the prosecutor's team trying to coerce him into admitting to stealing money from Tate, Santiful & Hamilton. The defendant did not admit to anything which made the prosecutors team visibly upset. Their demeanor, tone of voice and accusatory questioning should have never been able to proceed due to the facts that, 1) The Defendant was not in any physical/mental condition to participate in this proffer and 2) Counsel should have stopped the interrogational torture that was being directed at the Defendant.

The defendant was suffering most likely as the result of three (3) medications administered to him earlier that day. The prescription drugs were for treatment of depression & anxiety. The start of the meeting was delayed for approximately thirty (30) minutes until the defendant stopped vomiting and sweating profusely. The meeting should have been rescheduled for another day. However, the prosecutor's team and Counsel were faced with three hour travel each way and were insistent on interviewing the Defendant that day despite his unfit condition.
With dry vomit on his sweatshirt, in a state of mental and physical instability, the Defendant participated in the proffer the best he could.  To the Defendant's recollection the theft vs robbery argument was never discussed.

During April 2017, co-defendants Gondo, Rayam, Hendrix and Ward started to cooperate with the government. At the same time, the Defendant was being threatened by the prosecutor through Counsel with additional 924(c) gun charge(s) adding at least an additional twenty-five (25) years onto the sentence. Counsel suggested to proffer and "negotiate" a "livable" settlement with the government. In reality the proffer had nothing to due with the truth (Gondo and Rayam are longtime habitual criminals and liars) and/or justice but was played out as a feeble attempt to escape the strong

23

arm of the government. In a "what if scenario", if the Defendant admitted to taking money but not a 924(c) charge(s), what kind of jail time could be negotiated. In the end, the government's strong arm remained strong. And, Counsel kept cautioning Defendant that if he took a plea on something he didn't do, that would be perjury. At the conclusion of the second proffer, the Defendant remained steadfast that he did not take any money from subject drug dealers. i.e. no theft nor robbery.

On June 22, 2016, a superseding indictment was issued and of the seven (7) overt acts associated with the theft vs robbery argument on the original indictment, four (4) were dropped. The superseding indictment added two (2) additional overt acts of robbery/extortion , both of which fell within the theft vs robbery argument.

On September 13, 2017, the prosecutor offered a written plea deal on the superseding indictment in which he insisted on the Defendant admitting guilt to robbery. In discussions with Counsel, the Defendant maintained his innocence and turned down the plea deal. The defendant did not admit to taking money from any of the subject drug dealers.

On  October 13, 2017, Counsel submitted to the court three (3) motions on behalf of the Defendant and Co-Counsel, Jennifer Wicks, submitted nine (9) motions on behalf of Co-Defendant Marcus Taylor, all relating to the up-coming trial. On December 4, 2017, Counsel submitted three (3) additional motions on behalf of the defendant including court documents 224 "Compelling the production of Brady Material" and 225 "Precluding Witnesses from Referring to Alleged Acts as Robberies".

In document 224, the "Brady Motion", the argument centered around the prosecutor withholding information that would prove the Defendant acted legally when money was being seized and therefore the legal taking of money can't be viewed as robbery.  Counsel pointed out in the motion, "If Mr. Hersl took the money at some point thereafter, out of the presence of, and without the knowledge of the arrestee, the act was theft". The key word being "IF" denotes that there was no admitting to taking money.

In document 225, the "Robberies Motion", states in the title that the acts are alleged which denotes again there was no admitting to taking money.

24

On December 19, 2017, a motions hearing was held in the Federal District Court Northern Division with Judge Blake presiding. The Defendant, being in solitary confinement at Talbot County Detention Center during the entire last quarter of 2017, had neither knowledge of any motions being submitted nor discussion with Counsel about any motions, including the "Brady Motion" and "Robberies Motion", or any discussion regarding the theft vs robbery issue. He was transferred to the courtroom directly from his solitary confinement jail cell. During his courtroom appearance, the Defendant had no discussions with Counsel with regard to any motions and/or the theft vs robbery issue.

At the pre-trial motions hearing, the Defendant sat in ignorance as the motions arguments between the prosecutors and defense attorneys debated the fine points and the legal issues associated with each motion. When Counsel presented his argument on the "Brady Motion", the Defendant was able to pick up on the presentation dealing with the theft vs robbery issue. On page 38, line 23, of the transcript, Counsel states, "I've given the Government in numerous e-mails and discussions the theory of the case as the way I see it ...". On page 39, line 5, Counsel, in elaborating on the charged crimes, states, "If you look at the records from 2013, 2014, 2015, 2016, there's been hundreds and hundreds of guns which he's (Defendant) personally taken off the street. And what we have here from 2014 though 2016 is a handful, maybe five, maybe six incidents out of all those hundreds and we consider those incidents not to be good conduct, not to be – they are crimes, but the crimes would be a theft crime and not a robbery and/or extortion type of crime." Up to this point in the court presentation, Counsel's statements were in line with what the Defendant anticipated.

However, within seconds of continuing his presentation, on page, 39, line 16, Counsel stated, "His (Defendant's) conduct which he admitted to is of theft on these multiple occasions." And on page 40, line 18, Counsel stated, "It's a theft that should be tried in Baltimore City Circuit Court. It's a theft to which Mr. Hersl readily admits his bad conduct and what he's done in this these particular cases."

At this point the Defendant was unsure of his position with Counsel or his position within the court. Without the Defendant's prior knowledge and/or input, his Counsel admitted to the court that he took money. What was Counsel's strategy? What was the reaction of the judge? How would this effect the prosecutor's game plan? More concerning to the Defendant at the time was the dread he was facing

of being placed back in solitary confinement within the next hour. At the conclusion of the pre-trial motion hearing, holiday pleasantries were exchanged between the Defendant and Counsel prior to Counsel departing abruptly to meet with Judge Blake and other court participants in chambers.

Prior to trial, which was held on January 22, 2018, the Defendant had very little contact with Counsel. The Defendant lost trust in Counsel. The prosecutor provided Jencks material to Counsel on January 8, 2018.   The Defendant had one meeting with Counsel and was never shown any Jencks material but was asked a few questions mostly about the Hamiltons. There were no discussions between Counsel and Defendant regarding admitting to taking money. The Defendant not only lost trust in Counsel for making a major false statement, but the Defendant was in solitary confinement and unable to reasonably confront the problem. The best the Defendant could hope for, just weeks before trial, was for Counsel to have a good strategy up his sleeve.

During Counsel's opening and closing statement at the trial, he again stated that the Defendant admitted to taking money. At this point the Defendant was totally helpless and clueless. The defense strategy was totally in the hands of Counsel and the Defendant prayed for the best.

**Responsibilities of Counsel**
Address responsibilities of Counsel involved in this event of ineffectiveness taken from ABA

**Effect on Outcome of Trial**
The overwhelming evidence in this trial relied on oral testimony from witnesses. Even though some hard evidence was presented which was strongly in the Defendants favor, such as recorded audio on May 28, 2016, where dirty cops Gondo and Rayam stated they did not trust the Defendant. In essence the recorded conversation was proof that the Defendant was a clean cop and not part of a criminal conspiracy involved in racketeering. However, jurors seemed to heavily relied on individual's credibility.

By admitting the Defendant took money, for whatever reason, Counsel destroyed the Defendant's credibility of being a clean, honest, and hard working cop. When it was time for the jury to judge the Defendant, with his credibility lost and admitting to a crime, the jury may have felt compelled to

26

punish the Defendant. The only way to punish the defendant was to find him guilty of charges listed on the verdict sheet.

By Counsel making the false statement, it was material to the case, had an impact on juror perception, and questions the credibility of the trial.

### B. Ineffective in providing clear focus on case (El Chapo)

ABA Std. 4.1-8 (a) Defense counsel should not carry a workload that, by reason of its excessive size or complexity, interferes with providing quality representation, endangers a client's interest in independent, thorough, or speedy representation, or has a significant potential to lead to the breach of professional obligations. A defense counsel whose workload prevents competent representation should not accept additional matters until the workload is reduced, and should work to ensure competent representation in counsel's existing matters. Defense counsel within a supervisory structure should notify supervisors when counsel's workload is approaching or exceeds professionally appropriate levels.

### C. Ineffective in fully defending all charges

#### 1. Challenge of Government Investigation

#### 2. Challenge Integrity of Cooperating Co-Defendants

#### 3. RICO Conspiracy

### 4. Intestate Wire Fraud

**GROUND X**

Defense Counsel grossly failed to address Interstate Wire Fraud in that it was neither

    a) a fraud nor,

    b) an interstate wire transfer associated physically and/or mentally w/
       Defendant

    Violation: Ineffective Defense Counsel – Sixth Amendment violation

    Evidence: OT Slips, Rollcall Data, Baltimore City Audit

Hersl was charged and convicted of four racketeering acts of wire fraud. The fraud, stated as "Time and Attendance (T&A) Fraud" was the filling out, signing, submitting, and collecting on payroll overtime (OT) slips, while not working the hours stated on the slip. Since the data recorded on the OT slip was copied by payroll administrators and electronically transferred over state lines, the act was considered by the prosecutor to be interstate wire fraud. Hersl claims the prosecutor falsely charged on two accounts. First, there was no fraud and second, there was no interstate wire component to the charge.

With respect to the charge of T&A fraud, Hersl claims that there was no fraud. Hersl was financially compensated by a pay check through the Baltimore Police Department's payroll system for regular and OT hours he worked AND as a reward for seizing illegal guns off the streets of Baltimore.

Hersl's regular hours were monitored by his immediate supervisor and recorded by the supervisor on police department software called *Rollbook*.

Hersl's OT hours were also monitored by his immediate supervisor and upon Hersl submitting an OT slip for the hours, his immediate and next level supervisor, would sign the OT slip as authorizing officer and certifying officer respectively.

In addition to the hours worked however, Hersl claims he was also being compensated and rewarded by the Baltimore Police Department (BPD), through his immediate and next level supervisor, for the risk and danger, over and above the call of duty, involved with seizing illegal guns from suspected

criminals. The reward given was in the form of "overtime pay" and "time off", at the discretion of his <u>immediate</u> and <u>next level</u> supervisor. To complicate matters, the manner of processing the reward was entangled in an administrative and accounting process mired in an antiquated policy dating back over thirty (30) years. Hersl had no involvement and no responsibility with respect to the administrative and accounting process which was used by the BPD to compensate him. The prosecutor, with a full understanding of why and how Hersl was being compensated and rewarded, manipulated and disguised BPD's poor use of administrative and accounting practices to create the appearance of fraud.

With respect to an interstate wire component, Hersl claims the data he entered on an OT slip was hand written, only partially completed as directed by his immediate supervisor , subject to police supervisory checks and balances, not returned to him for review, and not subject to interstate wire transfer on his part. Hersl submitted his OT slip in Baltimore and a week later received his pay in Baltimore.

During the pre-trial time frame of this case and over multiple objections by Hersl, Counsel essentially ignored the charge of wire fraud in all discussions. Counsel never allowed the Hersl the opportunity to fully explain the circumstances with regard to the charge. Thus Counsel did not fully understand the Hersl's position, did not investigate the charge, did not interview any witnesses, did not plan a legal strategy to defend against the charge, and approached the trial fully unprepared with regard to defending against this RICO predicate crime. Prior to trial, Counsel never allowed the Hersl an opportunity to review and analysis the OT slips to counter the prosecutor's claim of fraud.

Being ill prepared to address the wire fraud issue at trial, Counsel did not call appropriate defense witnesses, inadequately addressed witnesses on cross-examination, and poorly counter argued the prosecutor's opening and closing statements before the jury.

Hersl addressed the Maryland State Commission  to Restore Trust in Policing on BPD's practice of Reward and Compensation n his open letters 008 thru 0015 (EXHIBIT B)

**5.  Jimmie Griffin**

**6.  Herbert Tate**

**7.  Antonio Santiful**

**8.  Hamilton's**

**9. Hobbs Act**

**III c.  Sentencing**

**IV.  Prosecutorial Misconduct**

**V.  Internal information leaks to the public from prosecutorial team**

Hersl has new evidence to present of a tainted GTTF investigation with a strong possibility that the investigation was manipulate and skewered against Hersl.

In June 2016, from a person of trust, Hersl became privy to information that linked an individual within the Internal Affairs Division (IAD) of the Baltimore Police Department (BPD) to an outside powerful and resourceful businessman.  Hersl thought the context and timing of the information was

odd. Afterwards, Hersl thought nothing of the information but always wondered why he became
privy to it. Hersl knew of both people, the individual within (IAD) and the businessman, but did not
associate with either.

During incarceration, from his arrest date on March 1, 2017, till after his trial in February 2018,
Hersl's mental state was altered due to prison medications and long term solitary confinement. In
April of 2018, Hersl's mental capacity began to improve. An advertisement that he saw on prison TV
triggered his memory and thought process to associate the statement he heard in June 2016 with
people involved with the GTTF Federal investigation.

Due to other circumstances that Hersl became aware of prior to his arrest, just prior to his arrest, and
during his trial, he is now aware that an individual within IAD, and part of the GTTF investigation,
illegally communicated specifics about the investigation to outside source(s). The outside sources
that were recipient(s) of the IAD information had motive to harm Hersl. Due to the power and
resources of the outside individual(s), the distrust of his trial lawyer and, lack of own personal
resources, Hersl did not feel safe to disclose his story back in April, 2018.

At this time, Hersl asks the court to appoint counsel for discovery regarding his claim. Although
totally not safe, Hersl believes bringing out this story, with guidance from counsel, is his best option
There have been a few reported instances of leaks in the GTTF investigation. However, a
communication leak from an IAD member on the investigation team had special implications for
Hersl. This leak not only undermined the integrity of the investigation but it appears to be driven by
hidden agendas and the use of underhand tactics to inflict harm on Hersl.

It is a American Bar Association (ABA) recommendation that the prosecutor make it his duty to seek
justice (Std. 26 - 1.2a) for the public (Std. 26 - 1.2b) and to maintain the secrecy and confidentiality
of criminal investigations (1.2 (d) (iv))

## VI. Judicial Interference

The Honorable Andre Davis, being a then RECENTLY retired 4th circuit appeal judge, made
derogatory public statements against Hersl and co-defendant, Marcus R. Taylor (hereinafter Taylor)

regarding the GTTF while Hersl and Taylor's case pended appeal before the 4th Circuit. By means of his legal stature, Judge Davis publicly induced himself and his statements into Hersl and Taylor's appeal. What Judge Davis did was immoral and unethical. It is uncertain what impact if any the public comments had on the appeal.

Hersl requested appeal Counsel, in some way, make the Davis circumstance a part of the appeal record. Any selected appeal judge would then have the opportunity to address their knowledge or lack of knowledge of the public statement made by Judge Davis and recuse themselves from the case if warranted.

His action may have had manipulation of the judicial system especially with regard to the 4th Circuit and the Hersl & Taylor case, has tarnished its credibility and integrity. What Judge Davis did should not be allowed to happen in the future.

The 4th Circuit should negate the appeal on grounds of attempted interference and send the case back to the District for a new trial.

On November 13, 2018, Baltimore City Solicitor and recently retired 4th Circuit Appeal Judge, Andre Davis, spoke to members of the Maryland State Commission to Restore Trust in Policing, including Chairman and retired Federal District Court Judge Alexander Williams. The address to the Commission was video-taped and can be viewed on Maryland Department of Legislative Services website: http://dls.maryland.gov/policy-areas/commission-to-restore-trust-in-policing

The address by Judge Davis is overall very derogatory of the Gun Trace Task Force (GTTF), in the fashion of a rhetorical lambasting. Judge Davis made no effort to separate the actions of individuals on the squad .

On the video , at minute 21:45, referring to the GTTF, Judge Davis states:
… These detectives, Judge Williams and members of the Commission, were thugs, criminal conspirators, drug dealers, armed robbers, the worst of the worst…,
at minute 24:57, Judge Davis states …by the way, the two that didn't plead guilty of course, their cases are on appeal…

The cases being on appeal did not keep Judge Davis from trying to convince another retired judge, in public, that both Hersl and Taylor "were thugs, criminal conspirators, drug dealers, armed robbers, the worst of the worst". (for the record, Hersl & Taylor were never charged or convicted of thuggery, drug dealing, and/or being the worst of the worst)

From this point on, the spread of Judge Davis' statement throughout the legal community, including the 4th Circuit, was uncontrolled. All of the judges on the 4th Circuit may have been exposed directly or indirectly to Judge Davis' position regarding members of the GTTF. It is not inconceivable for any judge on the 4th Circuit to hear from a friend who heard from a friend (maybe over lunch or at a Christmas gathering) that Hersl & Taylor are "thugs, criminal conspirators, drug dealers, armed robbers, the worst of the worst ".

Judge Davis intentionally tried to enhance public opinion against Hersl & Taylor. He also attempted to influence the 4th Circuit, directly or indirectly, with regard to Hersl & Taylor's appeal. The public will never know for sure if his attempt was successful. One thing is sure, Judge Davis tarnished the credibility and integrity of the judicial system with regard to the 4th Circuit by imposing himself in a conflict of interest situation for his own political gain.

RELIEF REQUESTED

Wherefore, Daniel Thomas Hersl respectfully moves this Honorable Court to vacate his conviction/sentence and/or to grant him all relief to which he may be entitled, pursuant to this 28 U.S.C. 2255 Motion. Hersl further asks that the Court grant the following:

1. Court appointed Counsel

2. Full access to all case discovery documents for review and analysis

3. Full transcripts of Grand Jury Proceeding for review and analysis of prosecutor misconduct associated with  1) non-disclosure of exculpatory evidence (May 27, 2016, Gondo/Rayam phone conversation) 2) non-disclosure of full facts regarding reward and compensation vs time and attendance fraud 3) non-disclosure of  full exculpatory evidence regarding Hamilton robbery

4. Discovery into illegal communications regarding the GTTF investigation by member(s) of the investigation team to outside sources.

5. An evidentiary hearing

**VERIFICATION**

I have read the foregoing "MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE" 28 U.S.C. 2255 and hereby verify that the matters alleged herein are true, except as to matters alleged on information and belief, and as to those, I believe them to be true and correct. Executed at the U.S. Medical Center for Federal Prisoners, Springfield, Missouri, on this 4th Day of November, 2020.

Respectfully submitted,

Daniel Thomas Hersl, by Jane Shott, agent
Daniel Thomas Hersl
Federal Inmate # 62926-037

**CERTIFICATE OF SERVICE**

I certify under penalty of perjury that the forgoing 28 U.S.C. 2255 Motion was placed in the prison's internal mail system, postage pre-paid, for service upon this Court via U.S. mail on this 4th Day of November, 2020 to:

United States District Court
Office of the Court's Clerk
101 West Lombard Street
Baltimore, Maryland 21201

Mr. Hersl respectfully requests the Court's Clerk Office to serve all other interested parties by electronic notification and serve the movant with a stamped and filed copy of this motion.

35