# EXHIBIT B

## Open Letters to the Maryland State Commission to Restore Trust in Policing (aka Ferguson Commission)

## Letters 001 thru 024

## dated April 22, 2019

## thru

## February 7, 2020

Open Letter to the Maryland State Commission to Restore Trust in Policing (A.K.A. Ferguson Commission)

From: Daniel Hersl

Letter 001

Date: April 22, 2019

Hello members of the Ferguson Commission. I'm sure that you are familiar with my name by now but not with me the person Daniel Hersl. I believe it is important for the people of Baltimore, the State of Maryland, and society in general to know and understand the whole story behind The Baltimore Police Department (BPD) and the Gun Trace Task Force (G.T.T.F). Thus, I am writing to provide my input to the Commission, an effort that I trust the Commissioners will find of value in achieving their mission to restore trust in policing. My experience and perspective is quite unique as it includes first-hand knowledge of being a Baltimore City policeman stretching from the "Zero Tolerance Era" to the "Freddie Gray Tragedy" to the G.T.T.F..

As you may know, I'm in the process of appealing my conviction on Federal RICO charges. Currently, my court appointed appellate attorney does not represent me outside the tight parameters of the appeal process. Therefore, presently I'm without the representation of a lawyer and taking a legal risk to write publicly about my involvement with the BPD and specifically the G.T.T.F. Nevertheless, I am fully innocent, have nothing to hide and consider my input the morally and ethically right thing to do.

First I would like the Commission to know a little about Daniel Hersl. I was born & raised in Baltimore City (Highlandtown) and lived in the city until my mid 30's. Baltimore is all that I know and too this day even after this tragedy I still LOVE BALTIMORE. Not only was I a Baltimore City employee but my brother Steve was a City firefighter for 20 years, my mom worked for the City as a office worker for approximately 30 years and last but not least my brother Matthew worked in the Finance Department for Baltimore City for 28 years until he was leaving work one day and was killed right outside of city hall. I miss Baltimore so much, from going to the ORIOLES and RAVEN games to eating at some of the great restaurants, to golfing at Baltimore City's great 5 public golf courses. I have always wanted the best for Baltimore and still do. It has always been my home town and remains so today.

As most people know, some streets within Baltimore City are quite dangerous, especially in and around the open-air drug markets. I would like the Commission to know that it was my regular duty to patrol these areas in a non-supervisory capacity. I would encounter on a near daily bases drug gangs, such as the Black Guerrilla Family and others, that were integrated into some of the surrounding neighborhoods. My life was so entwined with the Baltimore City drug culture that one of the drug dealers that I arrested on numerous occasions showed up in Federal prison beside me. Unfortunately for me, I had to spend the next 67 days in 24-hour lock down for "My Protection" and then transferred to my present location.

I am very proud of my seventeen plus years as a Baltimore policeman. I gave the citizens my very best effort because I wanted to make a difference in the effort to make neighborhoods drug and gun free. Looking back, I put my mental and physical well-being at a risk beyond the call of duty. Over the life of my career, together with well trained and supervised fellow officers, I assisted in saving scores of lives, ridding neighborhoods of millions of dollars of illegal narcotics, and seizing hundreds & hundreds of illegal guns. I had a street reputation of being an aggressive officer, but that was in light of defending the City, my fellow police officers and myself from an extremely dangerous and overly aggressive illegal drug trade that exist in Baltimore City.

Since I am incarcerated and without legal representation, I will provide my input to the commission in a series of open letters. I will attempt to write the letters on a weekly basis or so, depending on the demands of prison life. This is letter number 001.

Respectfully,

Daniel Hersl

**Open Letter to the Maryland State Commission to Restore Trust in Policing (A.K.A. Ferguson Commission)**

**From: Daniel Hersl**

**Letter: 002**

**Date: May, 1, 2019**

This letter to the Commission is with regard to a barrier standing in my way of providing better feedback to the Commission. It also stands in the way of the public getting the truth and the whole story behind the G.T.T.F.

*The barrier is I do not have the JENCKS associated with my case.* The JENCKS are the documents that the prosecutor turns over two weeks prior to the trial containing all of the information that is relied on to make the case. In my situation, I was told there are over 2,000 pages of JENCKS which can include police notes, reports, letters, memoranda, grand jury testimony, etc… and also what is known as 302's.

Supposedly, FBI policy prohibits any audio or video recording of interviews. Therefore, they use the 302 form to summarize each of their interviews including their interviews with me, other members of the G.T.T.F and witnesses. Obviously and notoriously, this method of verifying what was said in an interview is flawed and open to manipulation.

I have never fully seen or have had access to the JENCKS. More important, I have never been able to analyze the documents for completeness, truthfulness, conflicts, manipulation, and/or perjury. I know the JENCKS exist because I was able to briefly glance at a few of the 302's that were in my lawyer's binder on the defense table at my trial.  I was surprised to see some names on the 302s since I was unaware that those names had a role with the G.T.T.F.  I could bring up those names, however, I would not feel comfortable discussing what an individual did or did not do without knowing the whole story contained in the JENCKs. It would not be fair to the individual, me, the Commission, and the public.

Without the JENCKS, I am in the dark with regard to the whole story about the G.T.T.F. The Commission and the public are in the dark as well. Since all of the people associated with the G.T.T.F have taken a plea or have been convicted, the JENCKS should be made available to me, the Commission and the public.

Respectfully,

Daniel Hersl

**Open Letter to the Maryland State Commission to Restore Trust in Policing (A.K.A. Ferguson Commission)**

**From: Daniel Hersl**

**Letter: 003**

**Date: May 9, 2019**

With this letter, I ask the patience of the Commission. I believe my communication will enhance a better understanding of my story about the Baltimore City Police Department (and the Gun Trace Task Force (G.T.T.F.). My topic is mental trauma which I have encountered as a police officer (covered in this letter) and as an inmate (covered in the next letter). As I write this letter, I want to assure the Commission that I am relatively OK, for *what* I have been through. It appears that I am able to deal with trauma over the short term with no long term functionally damaging effects. However, as with anyone, trauma has altered my behavior, not in a bad way, but a way that my actions naturally adapt to survive.

I am sure the Commission would agree that seeing horrific injury, excruciating pain, and death affects a person emotionally. Personally, as a policeman I have witnessed tremendous human suffering, pain, and a lot of death. While being ambushed on Harford Road, I was on the receiving end of close range automatic bullet fire as my partner lay near me in a pool of blood clinging to life. To many people this is what you read in a book or see on the screen. To me it is real life, seventeen years of real life on some of the deadliest streets in the City of Baltimore. Emotionally I adapt but it takes time, sometimes maybe weeks, months, or years. Behavior wise, without realizing it, I naturally become more closely attached to my fellow officers. It is they who have my back. I depend on them, and they on me, for survival on the streets.

When I was transferred to the G.T.T.F. in January 2016, I worked with Sergeant Tom Allers along with detectives Momodu Gondo, Jemell Rayam and John Clewell. Officers Gondo and Rayam had a dirty reputation outside of the G.T.T.F. and I took my suspicions to Sgt. Allers in February, 2016. He assured me that Gondo and Rayam were not doing anything illegal and I had nothing to worry about. I was assigned as a partner to Officer Clewell who I interacted with about 90% of my time. My suspicions with regard to Gondo and Rayam remained, but when I interacted with them in a law enforcement action, they appeared to have my back and I had theirs. It was a combination of trusting them and not trusting them. When I wasn't with them, I didn't trust them but when I was with them on the street, as a matter of survival, I needed to trust them and I did. When it came to Gondo and Rayam, I was beginning to find myself in a "Serpico" position of being a good cop working with bad cops. This environment is validated by the Federal wiretap on Gondo's phone. On May 27, 2016, Gondo and Rayam had a phone conversation detailing how I was a clean cop, not to be trusted and a possible informer for internal affairs. The recorded conversation is hard evidence that I was in a dangerous "Serpico" situation, not part of any conspiracy and innocent of any RICO charges. Nevertheless, the Federal Authorities and Baltimore Police Department at a great disserve to me and my family, kept me in harms ways. I was trusting because I needed to be and everyone else was not, for whatever reason.

Respectfully,

Daniel Hersl

**Open Letter to the Maryland State Commission to Restore Trust in Policing (aka Ferguson Commission)**

**From: Daniel Hersl**

**Letter: 004**

**Date: May 22, 2019**

Being incarcerated while waiting and preparing for the legal defense process is very demanding on the mind and body; more so if you are an ex-street cop; and even greater so if you are innocent. In prison I have experienced traumatic mental stress (over and above what is normally experienced) on three occasions.

The first occasion was during my first half year or so in prison. I was transferred between three prison sites. The unknown of being transferred causes deep apprehension and panic. I was being treated by the prison for anxiety and depression with psychotic drugs which produced extreme nausea, sweating, fever, and stomach cramps. The day of my first interrogation, officials had to get me off the floor out of my fetal position and then I started to vomit. Prison officials provided me with water as I sat in a chair out in a hallway getting fresh air. Once at the meeting I was shivering and sweating profusely with vomit over my sweatshirt. During the interrogation, I continued to sweat and ask for water to drink because I was so dehydrated, dizzy & confused. Till this day I don't even remember the questions that were asked of me or what my replies were. I'm at a total loss of words why the meeting was allowed to proceed.

The second traumatic prison event occurred four months just prior to my trial. I was placed in protective solitary custody after an attempted attack on me by two inmates who found out that I was a police officer. I observed the attack coming and de-escalated the situation in enough time to alert the Correctional Officer. I was allowed to go outside once a week for a half an hour. During my trial, I entered the court room mentally depressed and having a difficult time with associating, perception, and focusing, due to the severe isolation. It wasn't until about two months after my trial, being in another prison and out of solitary confinement, that I realized my mind started to associate past events and regain some clarity. It is also when I realized that I had developed a distrust of my lawyer during the course of my confinement.

The third occasion of prison trauma I described as the 24-hour lock down in paragraph 4 of letter 001. During that event, I was celled with one other inmate in a continuously noisy cell block where I could hear but not see the rest of the inmates. I was also in the middle of collaborating with my lawyer with regard to my appeal. If my lawyer would call (I could not make calls) I would have to kneel down to be near the receiver of the phone and my ear would still be about 12 inches away. I would have to talk loud and had a hard time hearing my lawyer clearly.

I feel the prison trauma definitely had a tremendous negative effect on my cognitive abilities. The timing of these trauma events has led me to believe the prison transfers, the solitary confinement and the 24-hour lock down were intentional and used as psychological force. When I needed my brain the most, it wasn't totally there. The added fear, anxiety, and distrust just made things worst. The prosecutors used the psychological force to mold their case, not seek the truth. Again, this is why an analysis of the JENCKs is so important. Under the circumstances they were fabricated, their validity and truthfulness need to be questioned.

Although the prison trauma has been severe, my ability to make associations and the clarity of my thinking has improved. I am in hopes that there are no long term effects and I am ready to continue telling my story.

Respectfully,

**Daniel Hersl**

**Open Letter to the Maryland State Commission to Restore Trust in Policing (A.K.A. Ferguson Commission)**

**From: Daniel Hersl**

**Letter 005**

**Date: June 9, 2019**

**Dear Commissioners:**

I'm unable to view the Commission website or undertake extensive research in prison. I heavily rely on my family and friends to keep me abreast on current affairs, provide fact-finding assistance, and support me in my letter writing. Due to their dedicated help coupled with my experience, I would like to make a suggestion in this letter as well as other recommendations and suggestions to the Commission in future letters.

It is of the utmost importance that the Commission proceedings gain and keep the full trust of the Maryland citizenry. One way of instilling trust is to bring out truth.  As such, Article II, Section 71, Paragraph (i) 3 of the City Charter allows the Commission to administer oaths and affirmations. Therefore I would suggest that it would be in the best interest of the Commission and all involved that any and all testimony before the Commission be administered under oath or affirmation.

Respectfully,

**Daniel Hersl**

**Open Letter to the Maryland State Commission to Restore Trust in Policing (A.K.A. Ferguson Commission)**

**From: Daniel Hersl**

**Letter: 005 A – Importance of an Oath**

**Date: December 19, 2019**

**Dear Commissioners:**

I mentioned in open letter 005, the importance of administering an oath or affirmation to ALL that come before the Commission. I'm writing this short letter to re-affirm to you the importance of putting witnesses or anyone else that testifies before you, UNDER OATH. You may not realize it at this time how important this may be; but, my belief is that where my letters are going to take you, I think it's of the utmost importance to do so immediately.

Respectfully,
Daniel Hersl

Open Letter to the Maryland State Commission to Restore Trust in Policing (A.K.A. Ferguson Commission)

From: Daniel Hersl

Letter 006

Date: June 10, 2019

Dear Commissioners:

I can't iterate enough how important it is to me that the Commission be successful in accomplishing its mission of getting to the bottom of the G.T.T.F. story. Such an endeavor will bring more trust to policing in Baltimore. I am confident that when all the facts are presented to the Commission, I will be exonerated in the court of public opinion which will help me in the long run in my legal battles.

In this letter, I would like to bring attention to the fact that the federal investigation of the G.T.T.F. and the Shropshire drug trade organization (DTO) appears to be structured and guided for the purpose of a desired and planned outcome. Such a skewered process has manipulated the appearance of guilt vs innocence by bringing forward incriminating evidence while avoiding exculpatory evidence. Such a process steers clear of the full truth and is an obstruction to justice.

My first example of this unfairly orchestrated federal investigation is the obvious "no interview" of Elizabeth Geiselman. She is a "founding member" of the G.T.T.F. and a retired detective with 32 years experience.  She continued to work with the G.T.T.F. as a contract specialist from 2013 till its disbanding. The federal investigators did not interview Ms. Geiselman despite her unique knowledge of G.T.T.F. affairs. It appears that her input could shed light on the G.T.T.F. that would be detrimental to the federal case. An investigator most familiar with Ms. Geiselman and one that may have recommended a "no interview" would be TFO John Sieracki of Internal Affairs. I recommend that the Commission call TFO Sieracki to testify regarding his knowledge of the "no interview" of Elizabeth Geiselman.

My second example is the "limited interview" of Det. John Clewell. Most of my time ($\approx$ 90%) with the G.T.T.F. was spent with Det. Clewell when both of us were part of the unit. I believe John Clewell would provide testimony favorable to me. If he had damaging information, the prosecutor would have put him on the stand at my trial. It appears to me the investigators conducted a "limited interview" of Det. Clewell so as not to get information that would discredit their case against me. I recommend that the Commission call TFO Sieracki to testify regarding his knowledge of a "limited interview" of Det. John Clewell. I would also recommend afterward that the Commission call Det. Clewell to testify regarding his full knowledge of the G.T.T.F. and the Shropshire DTO.

Finally, information between the Shropshire gang and the G.T.T.F. (particularly Gondo and Wells) could exonerate some G.T.T.F. members including myself.  Therefore I strongly recommend that the Commission review all tapped communications of the Shropshire DTO and Momodu Gondo to ascertain any information that would lead to a better understanding of their history, relationship, and involvement with Jemell Rayam and other G.T.T.F members.

The JENCKs could shed a better light on the above the examples (and more) of a structured and guided federal investigation. I trust that the Commission will review the JENCKs for a more detailed analysis of this obstruction of justice.

Respectfully,

Daniel Hersl

Open Letter to the Maryland State Commission to Restore Trust in Policing (A.K.A. Ferguson Commission)

From: Daniel Hersl

Letter: 007

Date: July 31, 2019

Dear Commissioners:

There appears to be confusion between my statement of Letter 001 that "I am fully innocent" and remarks made in court by my trial lawyer that "I took money which should be considered theft - not robbery". In this letter, I will reiterate that "I am fully innocent" and at the request of the Commission's Council, Mr. Peter Keith, address the trial statements and any known public remarks made to the contrary.

With respect to the two Federal indictments against me, the initial one dated February 23, 2017, and a superseding one dated June 22, 2017, I was charged nine times with robbery/extortion. I was cleared of five robbery/extortion charges and currently stand convicted of four involving Tate, Santiful, Griffin, and Hamilton. With regard to all four of the convictions I avow that I did not take money in the form of robbery/extortion and/or theft. I further assert that there was no conspiracy on my part to do so and I was unaware of any conspiracy that may have taken place.

At my trial in January/February 2018, my lawyer made general statements to the effect that the evidence will show I was guilty of taking money which was associated with the non-violent act of theft and not the violent act of robbery. I was unaware that my lawyer was going to make such a statement. It was never discussed with me before trial and would never have received my consent or approval. My lawyer should have never made those remarks. I have not had the opportunity to speak with him about it and I just assumed that it was a failed legal strategy to get me possible leniency if needed at sentencing.

There is no physical evidence of me illegally taking money. There is physical evidence that I was above board and not part of any robberies/extortions and/or conspiracy. That evidence is a FBI tapped phone conversation between Gondo and Rayam on May 27, 2016.

In a *Sunpaper* report dated March 7, 2019, AUSA Peter Martinez stated that I, in at least two proffer sessions, admitted to misconduct. I am not sure what Peter Martinez was referring to. He was not present at the proffer sessions and must be referencing the 302 (FBI interview form). I have never seen the 302 and am unaware of what it states. During the proffer sessions, my lawyer kept telling me that he was worried the prosecutor was going to add a second 924(c) charge (use of gun during a violent crime) and that charge would carry an additional mandatory 25 years. Due to my desire to avoid additional charges and get out of prison my dialogue was in the "what if" frame of conversation. That is, "what if" I admit to this or that, when can I get out of jail? In the end, I did not admit to any crime, because under the advice of my lawyer, confessing to a crime I did not commit would be perjury. My big pre-trial decision was: commit perjury (plea) and get a light sentence or go to trial. I choose the trial. At night I feel at ease morally, ethically and legally. However, I do not sleep because I am in prison.

Respectfully,

Daniel Hersl

**Open Letter to the Maryland State Commission to Restore Trust in Policing (A.K.A. Ferguson Commission)**

**From: Daniel Hersl**

**Letter: 008 - Compensation/Reward for Guns Off the Street (Part 1)**

**Date: August 14, 2019**

**Dear Commissioners:**

I will address the charges, which are now convictions, against me for Time and Attendance (T&A) Fraud in a series of open letters titled "Compensation/Reward for Guns Off the Street". This issue has been twisted to be complex and complicated mainly due to the devious public and legal spin the U.S. Attorney's Office applied to the circumstances. Such prosecutorial misconduct has been made at the expense of the Baltimore Police Department's (BPD) earnest administration of rewarding officers for a work effort deemed above and beyond the normal call of duty.

I am writing this series of open letters at the verbal request of the Commission's Counsel, Mr. Peter Keith. He generally requested that I provide the Commission with details on my understanding of the happenings regarding the T&A Fraud charges.

At this time, I would also like to state that I am frustrated and disappointed that my defense of the T&A Fraud charges were not better elaborated during my trial. On numerous pretrial occasions I wanted to discuss these charges and approached my trial lawyer to explain the circumstances. Each time I was shut down because he apparently thought that the time would be better used to defend against Robbery, Extortion, Hobbs Act, and 924(c) gun charges. I wanted to zealously fight all of the charges against me (RICO and conspiracy issues as well); however, I feel that did not happen. To this day, I believe my trial lawyer does not know most of the intricacies of my defense against the T&A fraud charges. I will attempt to clearly present them in the upcoming letters from prison. Here is the story from the beginning.

I entered the force as a patrolman in 2000 while the Federal Program called "Project Exile" (getting felons with guns off the street) was the BPD's crime fighting strategy. At this time Baltimore also adopted Mayor Martin O'Malley's "Zero Tolerance" policy. During this initial phase of my career, for every illegal gun I confiscated, the Sergeant rewarded me with overtime (OT) for that day and a future day off (aka: slash day, gun day, or G-day). I never asked for this bonus. It was explained to me as being a long established tradition with the police force - a gun off the street gets you OT and a day off.

I was initiated into the specialized forces of the department in the 2001/2002 time frame. The units generally consisted of 7-8 Detectives under the immediate supervision of a Sergeant. Whether it was doing covert surveillance, acting on quick tips from informants, vehicle stops or patrolling hot corners/open air drug markets, these tasks could not be done by one officer alone. Due to the fast pace of activity, along with the very dangerous people and surroundings we faced on a daily basis, the need for a tight knit squad with members who were not afraid and well trained was a necessity. As a member of the squad my duty was to be a team player and it was the Sergeant's duty to keep the team unified and motivated.

So to say, if I get a gun arrest today, the rest of the squad pitches in and helps me. One squad member may submit the gun, the other may call the State Police Hotline to run the gun and the suspect's prior records, while another may interview the suspect with me prior to transporting him to the Homicide Unit for further interviewing, etc… When the Sergeant orders the squad to work together, he (she) usually rewards the squad together. The roles would most likely reverse in the next gun arrest and everyone on the team shared in the hazards & dangers, ups & downs, and the rewards.

Sincerely,
Daniel Hersl

**Open Letter to the Maryland State Commission to Restore Trust in Policing (A.K.A. Ferguson Commission)**

**From: Daniel Hersl**

**Letter: 009 - Compensation/Reward for Guns Off the Street (Part 2)**

**Date: August 16, 2019**

**Dear Commissioners:**

Of course when employees of any organization abuse their privilege of employment by falsifying their time records and getting paid for not working it financially burdens the system. In the State of Maryland and Baltimore City it takes away from children's education, recreation centers, and repairing of the infrastructure among other needed services. With regard to the Time & Attendance (T&A) Fraud charges/convictions against me, I reiterate my full innocence. The prosecutor has recklessly, grossly, and knowing misrepresented compensation in the form of a reward given to me by the Baltimore Police Department (BCP) as T&A Fraud. Thus, I stand convicted and imprisoned. My story continues:

As a street cop I noticed a change in the focus on crime in the latter part of 2014, when Mayor Stephanie Rawlings Blake brought the police strategy known as "Ceasefire" to Baltimore. At that time I was assigned to the V.C.I.S. (Violent Crime Impact Section) under Sgt. John Burns and the squad took on the new name of "Eastside Ceasefire". It was at this time the squad felt the continuous pressure to get guns, guns, and more guns off the streets of Baltimore.

Since 2014, the violence escalated out of control and when the civil unrest of Freddie Grey's death rocked the city, crime and guns mushroomed out of control. After the riots and the arrest of police officers by State's Attorney Marilyn Mosby, moral in the BPD was at an all time low. Only a few squads would hit the streets and aggressively pursue ridding the streets of illegal guns and drugs. I was always in one of the hard working squads. Everyone in the chain-of-command, from the Major on down, were reaping the rewards from the squad's dangerous work efforts. This mid-level supervisory chain knew that the squad always produced and they counted on the stats. This made them all look good when it was time for their weekly CompStat meetings where they would brag how their squads were producing because of their management expertise.

The positive stats would keep the Commissioner, Deputy Commissioner and everyone else out middle management's hair. They would always tell the Sergeants to take care of their people with overtime and days off. On a few occasions specialized squads were called to the Headquarters auditorium for a briefing. There at these meetings the Deputy Commissioners and Majors would emphases to the Sergeants - if your people work and really produce then take care of them. I recall Anthony Barksdale, a past Deputy Commissioner making such a statement.

After Freddie Grey all the way until my arrest, the squad that I was in produced the guns that made all the Command Staff look good. We were the ones chasing armed killers through alleys, fields, parks, apartment buildings, and in vehicles up and down some of the most violent streets in America. While the majority of the police force took a laid back approach after Freddie Grey, the squads that I was associated with took the risk, faced the danger and got the guns and drugs off the street. We never asked for help, rewards or at-a-boys but we were always motivated and appreciative of receiving a reward of overtime and slash days.

Sincerely,

Daniel Hersl

**Open Letter to the Maryland State Commission to Restore Trust in Policing (A.K.A. Ferguson Commission)**

**From: Daniel Hersl**

**Letter: 010 – Compensation/Reward for Guns Off the Street (Part 3)**

**Date: August 19, 2019**

**Dear Commissioners:**

Yes, I was compensated and rewarded by the police department for a work effort deemed above and beyond the normal call of duty, i.e. getting illegal guns (lots of guns) off the street. As the prosecutor painstakingly spun my compensation and reward to be a Time & Attendance (T & A) Fraud charge, I kept asking myself, "Is the jury confused"? I certainly was for many reasons. For one, even to this day, the prosecutor's charges as they relate to my convictions do not EQUATE and are ambiguous. I honestly don't think the prosecutor and thus the jury knows exactly what I did or what I am accused of doing. Please follow the logic:

<u>The Charges</u>
Indictment 1 dated February 23, 2017, stated I committed the TWO fraudulent overt acts of falsifying an Individual Overtime Report on July 14, 2016, and July 23, 2016.  However the indictment erroneously charged me with wire fraud for FOUR pay periods ending 7/6/16, 7/20/16, 8/3/16, and 8/17/16 in lieu of two pay periods ending 7/20/16, 8/3/16 . I should not have been charged with wire fraud for the periods 7/6/16, 8/17/16 because there were no fraudulent acts committed. Although Indictment 1 was superseded it still shows the recklessness of the prosecutor.

In the superseding Indictment 2 dated June 22, 2017, it stated I committed only ONE fraudulent overt act of falsifying an Individual Overtime Report on July 23, 2016, thus dropping the overt act of July 14, 2016 mentioned in Indictment 1. However in Indictment 2 the prosecutor repeated his error of erroneously charging me with wire fraud for FOUR pay periods ending 7/6/16, 7/20/16, 8/3/16, and 8/17/16 in lieu of the one pay period ending 8/3/16. Indictment 2 is the indictment of record and it again shows the repeated recklessness of the prosecutor. The prosecutor was not only reckless with his paperwork but unfortunately for me, reckless with my life.

<u>The Convictions</u>
With regard to <u>wire fraud conspiracy</u>, I was convicted by the jury for conspiring on pay period 7/6/16 even though I was not charged with any fraudulent act(s) during that pay period.

In addition I was convicted with four acts of <u>wire fraud</u> for the pay periods ending 7/6/16, 7/20/16, 8/3/16, and 8/17/16, even though I was never charged of any fraudulent act(s) during pay periods 7/6/16, 7/20/16, and 8/17/16.

In summary, I was overcharged by the prosecutor and over convicted by the jury. Why was the prosecutor obsessed with me to the point of misrepresenting the facts? Was the jury confused, biased, and/or complacent, all to my detriment? Nevertheless, the charge of falsifying an OT report on July 23, 2016 could logically substantiate wire fraud for the period of 8/3/16 and would equate the charge with the conviction. With regard to this wire fraud charge and its EQUATED conviction, I reiterate my position "THERE WAS NO FRAUD" and thus "THERE WAS NO WIRE FRAUD". I will further expound on my position in future letters.

Sincerely,

Daniel Hersl

**Open Letter to the Maryland State Commission to Restore Trust in Policing (A.K.A. Ferguson Commission)**

**From: Daniel Hersl**

**Letter: 011 – Compensation/Reward for Guns Off the Street (Part 4)**

**Date: August 21, 2019**

**Dear Commissioners:**

In a confusing way, the prosecutor never took the position that being compensated as a reward for a work effort deemed above and beyond the normal call of duty was fraud. However, the prosecutor knew exactly such was the scenario with regard to my case (as well as the entire Gun Trace Task Force (G.T.T.F.)). I was being rewarded for getting illegal guns off the streets of Baltimore. The compensation per gun was overtime (OT) for that day and a day off with pay (aka: slash day, gun day or g-day). Such compensation for rewards have been traditional within the police department. It is partially documented in a Baltimore City Audit titled "Report on Overtime at the Baltimore Police Department", dated October 24, 2018, on page 5. Ironically the audit on OT does not mention OT but does cover a "a paid day off" (slash day).

- Multiple commanders acknowledged the practice of awarding a paid day off without requiring an officer to work and without requiring use of an accrued leave day. Multiple commanders tried to justify the practice by arguing it was a necessary motivational tool.

The prosecutor capitalized on the OT system being poorly administered, which he knew was totally mismanaged, and used the situation to twist my compensation/reward as being fraudulent. OT policy in the Baltimore City Police Department is covered under General Order 6-87 titled "Overtime Pay". This 1987 policy is antiquated and has not kept up with technology and all of the labor agreements since then. In the October 24th audit mentioned above, on page 6, it states the Office of Professional Responsibility's (OPR) official position was that the policy on OT was too vague to require compliance, made no effort to clarify the policy, and did not feel comfortable making officers accountable for compliance. This was the system that I was working under. My job was to confiscate illegal guns. It was not to organize the OT system within the police department. To this day, General Order 6-87 is still the active policy on OT within the police department. There was no fraud, it was mismanagement and the prosecutor knew it and the jury apparently didn't understand it.

In addition, my work conditions and methods of compensation are covered under a labor/management agreement. Many if not all the elected leaders in FOP #3 are familiar with slash days and OT being used to compensate for a situation deserving of an award. Most, if not all, have encountered this method of compensation in their career. OT within the police department has been a long standing labor negotiation issue and it is not inconceivable that slash days were part of those discussions. Per a confidant, regarding the G.T.T.F., the leadership of FOP #3, including past President Gene Ryan, knew of their work efforts, compensation practices, and the elated accolades they received from politicians & top brass. To my knowledge, the FOP raised no official objection to the working conditions and the methods of reward and compensation for the G.T.T.F.. Thus management and the bargaining unit were apparently in at least a passive agreement with regard to the working environment of the G.T.T.F.. The prosecutor knew I was a member of the bargaining unit. Therefore, it would be reasonable for me to assume that my activities as an employee (work effort and compensation) were mutually agreed to by management and the union. There was no fraud. All parties knew what was going on, there was agreement (at least passive), and as a dues paying member I was working within such agreements.

Sincerely,

**Daniel Hersl**

**Open Letter to the Maryland State Commission to Restore Trust in Policing (A.K.A. Ferguson Commission)**

**From: Daniel Hersl**

**Letter: 012 - Compensation/Reward for Guns (Part 5)**

**Date: Draft**

**Dear Commissioners:**

The prosecutors' witnesses gave testimony during my trial that Sergeant Wayne Jenkins had discussions with, and the approval of, Police Commissioner Kevin Davis about getting illegal guns off the streets and taking care of the squad with overtime (OT) and slash days. The Director of Human Resources, Lieutenant Theodore Friel, gave testimony that Kevin Davis had the authority to do so. Friel also mentioned he gave out OT and slash days when he was a Sergeant in the Eastern District. Since Commissioner Davis approved my OT & slash days and HR Director Friel had a working knowledge and history of using OT & slash days, why was I being federally prosecuted for being compensated for a reward? It appears to me that I was set-up? Who would set me up? Why was I set-up?

I was never privy to such discussions about slash days and OT, but assumed Sergeant Jenkins was in regular communications with his chain-of-command and acted in accordance with their direction. He expressed many times his elation that the Command Staff recognized him for getting guns off the streets; the squad was being taken care of because their work speaks for itself; and, his acknowledgement of being congratulated by his superiors. Word always got back to the squad that our getting guns off the street put our superiors in the celebrity limelight at the weekly ComStat meeting.

From my perspective, it was obvious the chain-of-command was fully aware of the squad's work performance and encouraged its continuation by motivation through rewards. This letter will elaborate on the process I was required to follow in order to receive OT and a slash day as compensation for a reward.

All of my hours and leave were entered by my Sergeant into a departmental database containing my Lieutenant's roll book. Sergeants and higher ranks had official access to add and modify data in the database. I had <u>view only</u> access to my hours and leave recorded in my Lieutenant's roll book. I was not required to submit my regular hours. My Sergeant kept track of those hours and was responsible for entering them into the roll book. For OT and leave I was required to submit an OT or leave slip respectively. It was the job of my Sergeant to accordingly approve or disapprove the slips and then if needed enter the leave into the Lieutenant's roll book. The database did not have the capability to account for OT and/or slash days. My Sergeant kept track of the accumulation and use of slash days and he submitted the OT slip directly to the Lieutenant.

When I was part of an effort of getting a gun off the street, Jenkins, and other Sergeants prior to him, would instruct me to fill out an OT slip as a reward. All of the slips that I filled out always had my name, sequence# G491, S.S.#, date, payroll locator #, and my signature. <u>I never filled in the hours worked box and total hours box on the slip</u> because the Sergeant always stated that he would take care of that along with submitting the slips. In essence, my Sergeant tightly controlled the use and reporting of my work times, pay (regular & overtime), and slash days.

During my trial, it was stated that others would sign my OT slip and I would also sign their OT slips. In my case, I do not recall having signed anyone's slip or them signing mine. During my trial, I do not recall seeing any evidence that I signed for someone or they signed for me. In her testimony, FBI Agent Erika Jensen said she had trouble deciphering signatures.

Sincerely,

**Daniel Hersl**

**Open Letter to the Maryland State Commission to Restore Trust in Policing (A.K.A. Ferguson Commission)**

**From: Daniel Hersl**

**Letter: 013 - Compensation/Reward for Guns (Part 6)**

**Date: September 13, 2019**

**Dear Commissioners:**

In the early summer of 2016, I was being transferred from the detention center in Allegany County, Maryland, to the one in Talbot County. Such transfers were a nightmare for me because they caused severe anxiety attacks due to the unknown of what I was to encounter next. During the trip the transport van stopped in Woodlawn and FBI Special Agent Erika Jensen and an associate escorted me on the second leg.

I knew Agent Jensen because she took part in the 1st proffer (interrogation) session (see letter 004). At the time my frustration level was high and I got up the nerve to speak to her. I commented that she knew the overtime (OT) fraud charge was ridiculous and no one was defrauded. She stated she knew the charge was outrageous but added that the issue of too much OT in the Baltimore Police Department (BPD) is a major concern. Nothing else was said but as I suspected, something else was behind the OT fraud issue. Looking back, I should have engaged Agent Jensen more in the conversation. But, mentally I was drained from fighting the anxiety of the trip.

During my entire career, BPD officers have worked in task forces under the oversight of Federal Agents, including the FBI, DEA, and ATF. Over the years I would have to say that it was well known amongst the agents that for a policeman getting a gun off the street meant being rewarded and compensated with OT and a slash day. Agent Jensen worked side by side with TFO John Sieracki of BPD's Internal Affairs Division. The Sieracki family has a history of being street cops within the BPD. It is overwhelmingly likely that Sgt. Sieracki is familiar with OT and slash days being used as compensation and reward for getting a gun off the street. It is also extremely likely that the Sieracki family doled out and/or received such compensation and rewards. In addition it is hard not to believe that he shared this information with Agent Jensen – if she already did not know. That is why she commented to me the way she did on the trip to Talbot County.

At my trial, the prosecutor(s) and Agent Jensen, as a witness, stated that I falsely signed an OT slip affirming the preprinted statement on the slip:

> "We certify that the overtime hours reported herein are authorized,
> were in fact worked, and are correct."

Jensen, Sieracki, and the prosecutors knew the OT slip and its associated General Order 6-87 were antiquated, filled with ambiguities, and administratively misused for reward and compensation purposes as stated in my open letter 011. They even knew the process of filling out the OT slip as stated in my open letter 012. However, they negated to convey to the jurors that I was not responsible for certifying the OT slip. I was addressed on the OT slip as the officer REQUESTING OVERTIME. My Lieutenant, keeper of "roll book" certified the OT by signing as the CERTIFING OFFICER. After signing a request for OT, I would hand the slip to my Sergeant. I would never see the slip after that. After all signatures were entered on the slip, the Sergeant would drop it into the OT payroll box located on the 6th floor of the HQ Building.

Again it appears that I was set-up. Why would Agent Jensen and Sgt. Sieracki buy into setting me up under OT fraud charges that they knew were trumped up? Who was behind setting me up? Why?

Sincerely,

Daniel Hersl

**Open Letter to the Maryland State Commission to Restore Trust in Policing (A.K.A. Ferguson Commission)**

**From: Daniel Hersl**

**Letter: 014 - Compensation/Reward for Guns (Part 7)**

**Date: September 26, 2019**

**Dear Commissioners:**

Special Agent Erika Jensen and TFO John Sieracki were the lead investigators for the FBI and Baltimore Police Department (BPD) Internal Affairs respectively. Both were members of the prosecutor's team present at my trial. Of the two, Sergeant Sieracki was by far more experienced with regard to BPD operations then Agent Jensen. During Agent Jensen's testimony, she did not know several things about the process of an officer submitting overtime (OT). As mentioned in previous letter 013, Sgt. Sieracki with experience as a street cop and a supervisor knows the ins and outs of not only OT processing but also rewarding with OT and slash days. I feel very strongly, as a seventeen year member of the force, if Sgt. Sieracki told the truth, he would have to admit that he was involved with OT and slash days during his career with the BPD.

If Sgt. Sieracki was the more experienced investigator in this case then why wouldn't the prosecutors put him on the stand, in lieu of Agent Jensen, to testify? In my opinion it is obviously clear. Sgt. Sieracki would have to testify under oath about BPD's OT practices and his personal involvement with receiving and doling out OT and slash days. I am not saying Sgt. Sieracki did anything wrong. What I am saying is that Sgt. Sieracki would have to testify that as a standard practice, police officers are rewarded for getting an illegal gun off the street and compensated with OT and a slash day. Being a standard, out in the open, long held practice is not fraudulent. Did Sgt. Sieracki keep from the prosecutors his knowledge of OT and slash days or did the prosecutors coerce him into keeping his knowledge to himself and away from the public and the jury?

During the latter part of my tenure with the G.T.T.F., from June 14, 2016 thru March 1, 2017, my first line supervisor was Sgt. Wayne Jenkins and my second line supervisor was Lieutenant Marjorie German. I am sure they were keeping each other informed about the illegal guns off the street, OT, and slash days. I was never part of any such discussion, but I strongly believe their line of communication was active. That is how the chain-of-command in a paramilitary organization such as the BPD works. There were just too many guns, OT, and slash days coming and going for them not to talk. Besides, I was told that Lt. German reported about the illegal guns off the street at every weekly CompStat meeting. And she must have reported about the OT at the CompStat meeting because it was a major concern with the department.

I am not accusing Lt. German of doing anything wrong. What I am saying is that she was responsible for CERTIFYING my OT slips (yes that antiquated, ambiguous, and administratively misused slip) as a reward and compensation for getting illegal guns off the street. And because she was reporting all of the OT and guns off the street, under her command, to the Command Staff at the weekly CompStat meeting, there was no fraud. From my perspective, week after week, everyone in the Chain-of-Command was on board with getting illegal guns off the street and rewarding the officers with OT and slash days.

As part of the FBI's G.T.T.F. investigation, was Lt. German interviewed? What was the line of questioning and her testimony? What did the 302 (FBI interview form) report if there was one? I never knew Lt. German to have any problem with my OT request being filled out as compensation for being rewarded. Did she say otherwise in the FBI interview? As a legal defendant why was I kept in the dark about her FBI interview(s) or lack of? As the certifying officer on the OT slip, why wasn't Lt. German called to testify for or against me at the trial? Wasn't her knowledge and testimony important if not crucial?

Sincerely,

Daniel Hersl

**Open Letter to the Maryland State Commission to Restore Trust in Policing (A.K.A. Ferguson Commission)**

**From: Daniel Hersl**

**Letter: 015 - Compensation/Reward for Guns (Part 8)**

**Date: November 14, 2019**

**Dear Commissioners:**

Less than three months after the Gun Trace Task Force (G.T.T.F.) was charged with Time & Attendance (T&A) Fraud on March 1, 2017, it was reported in the local news media that state prosecutors arrested Lt. Steven Bagshaw of the Baltimore Police Department (BPD) on two counts of felony theft. Lt. Bagshaw allegedly did not show up for some of his scheduled shifts, was forgoing documentation of days he took off, and filing overtime hours that he didn't work.

I am not privy to the details of the case, only what was conveyed to me as reported in the local press.

Lt. Bagshaw was found guilty, in March 2018, of felony theft and misconduct in office. The *Sunpapers* reported: A juror, who spoke on the condition of anonymity for fear of reprisal, said the case showed major problems with the way police regulated pay. The misconduct-in-office count "was hardest because, despite [the] theft, jurors felt he was left without proper oversight and was failed by the system," the juror said.

The *Sunpapers* also reported: At sentencing, Judge Melissa Phinn stated, "I don't think the Baltimore City Police Department has clean hands," and with regard to Lt. Bagshaw she stated, "He was put in a bad situation." Judge Phinn felt compelled in light of the jury conviction to give Bagshaw probation before judgment over jail time (no criminal record), and pay no restitution. After Judge Phinn's controversial decision, juror Billy Ford said. "We (the jurors) never dreamed that he (Bagshaw) would actually get jail time and would have been mortified if he did,"

It appears obvious that Judge Phinn and the jury sensed that the cause of Bagshaw's dilemma was due to BPD's lack of fiscal and supervisory oversight. I find it easy to empathize with Judge Phinn and the jury - because I've been there and experienced it. In Bagshaw's case, even with his supervisory authority as a Lieutenant, and his control of the digitized roll book, he apparently found the T&A system difficult to maneuver. I on the other hand was a street detective with absolutely no supervisory authority to deal with any of the shortcomings of the payroll system. For sixteen years, when it came to getting paid, I followed my Sergeant's instructions including when and how to fill out OT slips. My supervisors, like Lt. Bagshaw, were stuck in an antiquated payroll system. I was never told, less given a warning that I was doing something wrong or violating payroll policy. However, on year seventeen, in a cruel, inhuman, and unjust manner, I, a non-supervisory police officer, was federally charged with a conspiracy to commit T & A fraud and interstate wire fraud. Tonight I sit in my jail cell pondering to myself, "Who set me up and why"?

Despite all of the: 1) citizen concern and outcry; 2) employee turmoil and anguish; 3) expenditure of legal resources; 4) political rhetoric and promises by city officials; BPD's mismanagement and lackadaisical administration of overtime continues. The regulation on overtime, General Order 6-87, dated 20 March 1987, has yet to be updated to reflect today's working environment. In a vindictive way, city officials seem more motivated on ignoring their mistakes by suing Bagshaw for $8,600 of restitution than fixing their mistakes of mismanaging and poorly administering T&A including overtime. It is the vindictiveness, even from city officials involving themselves in police matters, that perpetuates mistrust in policing.

Sincerely,

Daniel Hersl

**Open Letter to the Maryland State Commission to Restore Trust in Policing (A.K.A. Ferguson Commission)**

**From: Daniel Hersl**

**Letter: 016 – The Serpico Environment**

**Date: November 22, 2019**

**Dear Commissioners:**

Frank Serpico served as a New York City police officer from 1959-1972. He is known for reporting widespread systematic corruption within the New York City Police Department. On February 3, 1971, while carrying out a drug raid Serpico was shot in the face by a suspected drug dealer. He realized that his fellow officers who accompanied him on the raid were gone and had left him to die. It later seemed obvious that he was set-up to be murdered for ratting out on police corruption. Frank Serpico survived the gunshot wound. There was no formal investigation into his shooting. Frank Serpico unceremoniously received NYPD's highest honor, the Medal-of-Honor, a month before retiring in June, 1972.

In letter 003, I describe myself being in a Serpico Environment with dirty cops Momodo Gondo and Jemell Rayam. My definition of a Serpico Environment is when an honest policeman is positioned to work amongst corrupt cops who may bring harm to the honest policeman and suffer no consequences for doing so. The honest officer needs to be very careful in reporting any corruption else he/she may find themselves set-up to be in harm's way by the dirty cops.

As I stated in letter 003, I reported my suspicion of Gondo and Rayam to my immediate supervisor Sgt. Tom Allers. After no immediate action was taken that I could see, I had to be extra careful as I suspected I was working in a Serpico Environment. At that time, I was unaware that Tom Allers had reported Gondo and Rayam up the chain on at least four occasions. I can see how sensitive the situation was. Sgt. Allers was also in a Serpico Environment and had to be cautious. Looking back, what is most disturbing to me is that upper supervision left me, as well as my partner John Clewell, in harm's way without the slightest warning.

The FBI wire tap of May 27, 2017, revealed the FBI and Baltimore Police Department's (BPD) Internal Affairs Division (IAD) also knew of me being in a Serpico Environment and did nothing. In the wire tap discussion, Gondo and Rayam revealed their suspicions of me being an informant against them. I did not trust Gondo and Rayam but was forced to work with them. I did not know who to trust in supervision, and after learning about the May 27th wire tap, prior to my January 2018 trial, I found out that even the FBI and IAD can't be trusted. The atmosphere of having untrustworthy individuals in supervision, the FBI, and IAD continues today. By being untrustworthy, I do not mean that someone may lie to you, I mean someone may kill you.

Gondo and Rayam were dirty cops for over a decade. Who in supervision was protecting them and why? The infamous duo were also closely tied to drug dealers other than the Shropshire Gang. Are the corrupt supervisors tied to the drug gangs as well? I suspect they are. These questions have yet to be answered and until they are, there are some officers in the BPD working like I was - in an untrustworthy and very dangerous Serpico Environment.

In my seventeen year career with the BPD, I have aggressively confiscated illegal drugs, guns and profits off the streets of Baltimore. That is what I was trained, instructed, and paid to do. My work effort impacted the illegal drug trade in the metropolitan area. In previous letters I eluded to being set-up. Neither do I know who set me up nor do I know the details of this complex set-up. I do have my suspicions and my thoughts echo a statement that Judge Melissa Phinn made in the Bagshaw case (see Letter 015) - "I don't think the Baltimore City Police Department has clean hands". Her thoughts were about payroll, mine are about BPD maintaining a Serpico Environment.

Sincerely,
Daniel Hersl

**Open Letter to the Maryland State Commission to Restore Trust in Policing (A.K.A. Ferguson Commission)**

**From: Daniel Hersl**

**Letter: 017 – The Serpico Environment & Detective Sean Suiter**

**Date: November 22, 2019**

**Dear Commissioners:**

Although it was reported after my trial by my brother Stephen that I was aware of who killed Sean Suiter, I want to set the record straight that I do not know how Sean Suiter died. My loving brother was distraught over the outcome of the trial and emotionally misspoke.

I would like to share my concerns with the Commission about the Suiter case. A month prior to my arrest on March 1, 2017, I was transferred from the Gun Trace Task Force (G.T.T.F.) to the City Wide Shooting Unit along with Momodu Gondo. During my time there I realized that Gondo was familiar with Suiter who worked a floor below Gondo and me.  Suiter would come up and meet with Gondo frequently. I am aware that both Suiter and Gondo were acquaintances with two individuals that resided in the neighborhood of Bennett Place. I did see all four meet a few times at Baltimore Police Department (BPD) Headquarters Building in February 2016.

After Detective Suiter's death, I wrote a letter to the BPD in early December, 2017, informing them of the above information. Remember, at the time I had been in solitary confinement for at least two months and my cognitive ability was somewhat compromised. The letter was given to my lawyer whom I assumed passed it on the BPD.  I do not have a copy of the letter and do not remember the exact specifics of it. The intent of the letter was to say that Momodo Gondo knows the two individuals residing in the Bennett Place neighborhood. If Gondo was forthcoming with the identity of the two individuals, investigators would have a lead to persons living in the Bennett Place neighborhood who had contact with Sean Suitor. No investigators have ever contacted me to elaborate on my letter. Being out of solitary confinement, I may be able to clarify and/or expand on its contents. However, I need a copy of the letter and be asked to re-evaluate it.

I want to make it clear: 1) I have no reason to believe Sean Sutter was a dirty cop; 2) I do know, Momodo Gondo and Jemell Rayam were very dirty and dangerous cops; 3) I do know that Gondo and Rayam have dirty connections with many drug dealers throughout the city other than the Shropshire Gang; 4) I do not know the full relationship between Suiter and/or Gondo and/or the two acquaintances from Bennett Place; 5) During the last two weeks in February, Gondo frequently texted and talked to one of the acquaintances; 6) If Sean Suiter was going to testify against Momodo Gondo and/or Jemell Rayam then Bennett Place put him in an extremely dangerous Serpico Environment; 7) The involvement in Suiter's death by BPD supervision (unknown corrupt individuals protecting Gondo & Rayam) was neither investigated, nor ruled out, nor reported; 8) It was never mentioned what knowledge or involvement  the FBI and/or the BPD had of Sean Suiter being placed in a Serpico Environment before his death.

In summary, I do not know what happened to Sean Suiter at Bennett Place on November 15, 2017.  I do have knowledge and experience to recognize a "Guided Investigation" when I see one (see Letter 006). The investigation on Suiter's death appears guided. The "criminal structure" behind the Serpico Environment that Sean Suiter faced, i.e. the association between Gondo/Rayam, supervisors protecting Gondo/Rayam, and drug dealers controlling the area around Bennett Place should be viewed as a prime suspect in his death.

Sincerely,

**Daniel Hersl**

**Open Letter to the Maryland State Commission to Restore Trust in Policing (A.K.A. Ferguson Commission)**

**From: Daniel Hersl**

**Letter: 018 – Jimmy Griffin (Part 1 - Background)**

**Date: December 6, 2019**

**Dear Commissioners:**

The next series of letters are being written at the verbal request made earlier by the Commission's Council, Peter Keith. I was generally asked by Mr. Keith to address the four robberies I was federally convicted of in February, 2018. I was indicted for seven other robberies that will not be addressed. Six of those robberies were dropped by the federal prosecutor(s) for reasons I am not fully privy to and one robbery I was exonerated from by the jury.

Even though I was convicted of robbery with regard to four events, in reality there were no robberies or any other type of illegal taking of money on my part. I will organize the four subject events in order of date-of-arrest starting with Jimmie Griffin, followed by Herbert Tate, Antonio Santiful and finally Ronald Hamilton.

The incidents that I am reporting on are to the best of my recollection under my current circumstances. I have no incident reports, notes, search warrants, Jencks, and/or other documentation available at my disposal to refresh my memory on these events. I do have a copy of my trial transcript.

The first event which I bring to the Commission's attention is the arrest of Jimmie Griffin on November 5, 2014. Jimmie is a known, confessed, and convicted major violent heroin distributor in the Baltimore Metropolitan Area. Approximately twenty police officers were involved with the raid on his home and his subsequent arrest. None of the officers were ever part of the Gun Trace Task Force (G.T.T.F.) and I was assigned lead investigator on the case by my supervisor, Sergeant John Burns.

For over two years subsequent to Griffin's arrest, I was unaware of any complaints by him regarding the event and Griffin was not mentioned in the 1st indictment against the G.T.T.F., dated February 23, 2017. After I refused to take a plea bargain, I was given a 2nd indictment dated June, 22, 2017. That indictment dropped four robberies against me that were mentioned in the 1st indictment. However, the 2nd indictment briefly and vaguely added an accusation of me robbing Jimmie Griffin of $5,100. It appears that Jimmie Griffin, who was in federal prison when I was arrested, came forward with his story of me robbing him amid a torrent of media propaganda being published against me. Apparently, the prosecutor made a deal for immunity with Jimmie and the Grand Jury added the robbery charge against me on their indictment. The format and wording of the 2nd indictment also leads me to believe that the Grand Jury may not have been aware of the prosecutor's decision to drop four robberies against me from the previous indictment. The whole affair of the prosecutor adding and dropping robbery charges against me highlights the fact that the U.S. Attorney's Office was basing their entire robbery case against me on the sole verbal testimony of people involved with illegal drug activity. Such individuals are usually not credible people, including decade long dirty cops, Momodu Gondo and Jemell Rayam.

Just prior to his arrest, Jimmie Griffin had a 2012 felony gun conviction and was a reputed heroin dealer/gun totter and bloods gang member. He was convicted in Federal court for the criminal activity associated with the November 5, 2014 arrest. Three years after I arrested him, Jimmie Griffin, a major Baltimore City and Carroll County heroin distributor was given immunity by the U.S. Attorney's Office for his testimony against me in the G.T.T.F. trial. Griffin was released from Federal prison within a month after his testimony.

At my trial, Jimmie testified that at the time of his arrest he was not employed, earned a living selling drugs, was in possession of his personal $1,000 (4 ounce) stash of weed, and was actively smoking the weed at the time of arrest. Unfortunate for me, the jury believed him over the testimony of two honest police officers not associated with the G.T.T.F. or the jury didn't quite hear and/or understand all of the testimony.

Sincerely,
Daniel Hersl

**Open Letter to the Maryland State Commission to Restore Trust in Policing (A.K.A. Ferguson Commission)**

**From: Daniel Hersl**

**Letter: 019 – Jimmy Griffin (George Lee)**

**Date: December 8, 2019**

**Dear Commissioners:**

Jimmie Griffin lives in Northeast Baltimore City, on Pinewood Ave. off of Harford Road. A few days prior to his arrest, I received information from a confidential informant (CI) in reference to Jimmie Griffin. The CI advised that Jimmie Griffin was distributing large quantities of heroin throughout Baltimore City and especially in Westminster, Carroll County, Maryland, where he was making a lot of money. The CI went on to advise that Jimmie did not have a vehicle and that his mother would drive him out to Carroll County so he could deliver his product and also collect proceeds from those who were distributing the deadly opioid narcotic for him. The CI went on to point out Jimmie's house at 3028 Pinewood Ave., his mother's car (I remember it to be a blue older model Mercedes or BMW). The CI also advised me that Jimmie's mother was a Baltimore City Public Works employee who sold heroin to other city employees while she was at work. In addition, the CI advised that Jimmie's mother's nickname around work was "Lady Heroin". This CI had a past history of being very reliable and most informative.

At around 8 AM, on the morning of November 5, 2014, Det. Iacovo and I equipped ourselves with the information from the CI, a picture of Jimmie Griffin, and his prior rap sheet. We parked a small black surveillance vehicle (with all tinted out windows) across the street from Jimmie's Pinewood Ave. address. After sitting there and watching for hours, no one entered or exited the house. At about noon time, we observed a black sports utility vehicle (SUV) pull up directly in front of our vehicle and stopping a few feet from the curb. The man exiting the SUV was a heavy set male wearing what are referred to as skinny jeans (very tight jeans). There were no other people in the SUV. The man, now known as George Lee proceeded to walk to the side door of Jimmie Griffin's residence before entering the dwelling. Within minutes, George Lee exited Jimmie Griffin's home from the same side door carrying bundles of cash in both hands. The fact of the matter was that George Lee was wearing skinny jeans and could not fit the money into his pants pockets.

George Lee, seemly in a hurry, entered his vehicle and sped off. Detective Iacovo and I attempted to follow but Lee was driving too fast. Iacovo (on his cell phone) notified Sgt. Burns and Det. Romeo who were part of an arrest team waiting nearby on Harford Road. Iacovo told Burns the vehicle description and location. Sgt. Burns and Det. Romeo proceeded to conduct a vehicle stop on George Lee in the black S.U.V. While the vehicle was stopped on Harford Rd., Det. Iacovo and I parked our surveillance vehicle a few blocks away and walked to where the S.U.V. was stopped. Once I got there I spoke to George Lee, who was the driver and only occupant of the vehicle. I told George that I was conducting an investigation and I asked where he was coming from. George Lee stated, "Dutch Village", a housing apartment complex further west on Northern Parkway/Harford Road than Jimmie Griffin's house. I then asked George Lee if there was anything in the vehicle that I needed to know about and he said no. A K-9 dog unit was immediately summoned and arrived at the scene shortly. The K-9 Dog alerted on the vehicle and once I searched the vehicle there was approx. $8,500.00 in the glove box and several clear bags w/white residue (suspected narcotics). I then asked George where he got the money from and if he had a receipt for it and he said that he won it shooting dice. George Lee was placed under arrest and charged accordingly.

After attending to George Lee, I went and prepared a search warrant for Jimmie Griffin's Pinewood Ave. address. Hours later the squad I was in and members of other squads assisted in executing the warrant.

Sincerely,
Daniel Hersl

**Open Letter to the Maryland State Commission to Restore Trust in Policing (A.K.A. Ferguson Commission)**

**From: Daniel Hersl**

**Letter: 020 – Jimmy Griffin (Raid)**

**Date: December 24, 2019**

**Dear Commissioners:**

Approximately 15-20 police officers were involved in conducting the search warrant on Jimmie Griffin's home. Jimmie was considered armed and dangerous. Sgt. Bailey hit the basement side door with me and a few other officers. Another team hit the 1st floor front door entrance simultaneously. Other officers secured the perimeter. At first we located a couple of small children (approx. ages of 4 to 7) who were home alone. After a few minutes Jimmie Griffin's sister arrived and when she was asked why the children were left unattended she stated that Jimmie was suppose to be watching them but left them by themselves.

Once the dwelling was secured I remained in the basement and executed the search warrant with Det. Fassl and Officer Fillion. The basement of the dwelling is where Jimmie Griffin had all his belongings. I located in the basement in the presence of Det. Fassl and Officer Fillion: 1 handgun which was located inside a dresser drawer; Jimmie's Gun Offender Registry paperwork; a red bandana which Bloods Gang members frequently wear; 1 hydraulic kilo press (which compacts drugs into a brick form); Bloods Gang paperwork; personal mail in the name of Jimmie Griffin; drug packaging material; and a large quantity of heroin.

During my search of the basement, I was called by my commander, Sgt. Burns, to the upstairs 1st floor. There he showed me a firearm, which was in Jimmie Griffin's mother's bedroom. The firearm was not secured and anyone could have access to it, especially Jimmie and the very young children. It turned out that Jimmie's mother did have a gun permit but it also turned out that her husband, who also shared that same bedroom, was a convicted felon and was prohibited from being around firearms.

While I was on the 1st floor, Sgt. Burns and other officer's advised me that they found $4,003 in a 2nd floor vacant bedroom that contained only an open safe. Jimmie's mother and her husband by then had come to the dwelling. I asked both of them: "Whose money is it?" and "How much was there?" I specifically remember them saying: "Oh I don't know." "I don't know who's room that is." "I don't know how that safe got there." "I don't know how much money is in there." The officers then counted the money in front of Jimmie's mother and her husband. I never went upstairs to the second floor. I returned to the basement to continue my search there. Before leaving the house all the evidence (except for the hydraulic kilo press) was put into a box for transport and a copy of the search warrant was given to Jimmy Griffin's mother.

The only money located, seized and accounted for at the house was the $4,003 from the 2nd floor safe. Neither I nor anyone else stole any money. As explained in letter 019, George Lee was seen exiting the side door of the house with bundles of money and shortly after arrested with $8,500 in his possession. That money was seized and submitted to evidence control. By Jimmie Griffin's calculations he said he was short $5,100 which he accused me of taking. In reality, he was short $8, 500 which George Lee took. During my trial the U.S. Attorney's Office (USAO) never made Jimmie Griffin account for the $8,500 and the jury bought it hook line and sinker.

In summary, it's pretty plain and simple. Jimmie Griffin was very mad that I arrested him and sent him to prison. With the assistance and knowledge of the USAO, Jimmie committing perjury for immunity and was release back on the streets of Baltimore. It makes me sick that over a dozen police officers put their lives at great risk to make the streets of Baltimore safer and the USAO was responsible for releasing a major heroin distributor back into the society that he preys on. Jimmie Griffin beat the system for now but I intend to prove that he indeed committed perjury. Till then I'm the one in prison and the streets of Baltimore are more violent than ever. Still I wonder who set me up and why?

Sincerely,
Daniel Hersl

**Open Letter to the Maryland State Commission to Restore Trust in Policing (A.K.A. Ferguson Commission)**

**From: Daniel Hersl**

**Letter: 021 – Jimmy Griffin (Arrest)**

**Date: December 27, 2019**

**Dear Commissioners:**

**Without my work files and notes at my disposal in prison to stimulate my recall, I will continue with the insane Jimmie Griffin saga and the story of his arrest from raw memory.**

**The same confidential informant that was mentioned in open letter 019 had previously provided Det. Romeo and me with a location where Jimmie Griffin spent a lot of time and also conducted some of his illegal drug business. After the search warrant was concluded at Jimmie's home on Pinewood Avenue, I drove to his hangout about 15 minutes away on Evesham Avenue in the Belvedere Section of North Baltimore. There I along with about a half dozen other officers carried out the arrest of Jimmie Griffin.**

**Sgt. Burns and I knocked on the front door of the Evesham residence and were met by a middle-aged woman who identified herself as the owner. After explaining why we were at the home, she verbally granted permission to search the premises. Sgt. Burns, Det. Fassl & Iacovo and I searched the house while Officer Fillion and Det. Romeo searched the backyard. Other officers may have been involved but I do not recall at this time. The house search was very brief as it was interrupted by Det. Romeo asking for our assistance in the backyard via police radio. There Det. Romeo advised everyone that he had Jimmie Griffin in custody.**

**Jimmie was with 3 or 4 other Bloods Gang members. They had been sitting in an older model parked vehicle smoking marijuana. Det. Romeo and Officer Fillion advised me that Jimmie Griffin lied to them several times about his name and even when I asked him he continued to lie about his name. However, Jimmie did not escape being identified because Det. Romeo was equipped with Jimmie's photo.**

**Jimmie Griffin was wearing an older style red leather jacket with a lot of zippers on it representing Blood Gang affiliation. I immediately sensed Jimmie being under the influence. When I approached him and spoke to him he had a very strong odor of marijuana protruding from his person along with a slow, loud, stuttered speech. At my trial, under oath, Jimmie admitted to purchasing 4 oz of high quality marijuana ($1,000 worth) before he went to the Evesham house. Judging by his appearance, demeanor, and communication, I would say it was a safe bet that he smoked all of his marijuana.**

**Once under arrest and searched by me, nine $100 bills were seized from Jimmie Griffin along with 2 gold chains, which I handed to Det. Iacovo. There was nothing else on Jimmie's possession, not even a trace of the 4 ounces of marijuana he purchased nor any car keys from his supposedly newly purchased car. Det. Romeo, who was standing next to me at the time, testified during my trial that he observed me remove a small wad of money from Jimmie's person, which was nowhere near the $6,000 Jimmie Griffin had claimed. I remember putting the $900 into the evidence box in the back of the police vehicle's trunk. After being arrested no one from my squad debriefed Jimmie Griffin because his speech was impaired from being high on marijuana. Jimmie was transported to the Eastern District and temporarily held for later questioning and still later processed at Central Booking. I processed the arrest on Central Booking computers.**

**In summary, a big time very dangerous heroin distributor was taken off the streets, no money was taken by police, and all police personnel went home safe. However, in the drug world, paybacks are hell. Jimmie's perjury against me on the stand was a payback. Are Jimmie and Blood Gang members more involved in the complex set-up against me? I can say with certainty they have a strong MOTIVE and the RESOURCES. What puzzles me most is why did the US Attorney's Office give Jimmy immunity? What was their motive?**

**Sincerely,**
**Daniel Hersl**

**Open Letter to the Maryland State Commission to Restore Trust in Policing (A.K.A. Ferguson Commission)**

**From: Daniel Hersl**

**Letter: 022 – Jimmy Griffin (Apparent Supplier Escapes Charges)**

**Date: January 25, 2020**

**Dear Commissioners:**

While under police surveillance, George Lee was seen exiting Jimmie Griffin's house with a substantial bundle of money. The money was not in his pockets or wrapped up in a bag but it was grasped in his stretched hands in public view. The bundle of money turned out to be $8,515. Inside Jimmy Griffin's house was over 300 grams of raw heroin. George Lee was the apparent supplier of drugs for Jimmie Griffin and was later arrested and charged as such.

A few days after the dual arrest of Lee and Griffin on November 5, 2014, I along with other members of my squad met with Baltimore City Assistant State's Attorney (ASA) Christine Celeste to discuss the case. ASA Celeste was elated that Jimmie Griffin was arrested with a large amount of heroin and a gun. She informed us about an earlier event in 2011 where Jimmie Griffin allegedly robbed a man and shot him in the face. The incident happened as the gentlemen left Valentino's restaurant on Harford Road around the corner from Jimmie's residence on Pinewood Avenue. ASA Celeste was furious that Griffin eluded the attempted 1st degree murder charge. She believed his mother was not truthful and testified that Jimmie Griffin was at home while more credible evidence proved otherwise. ASA Celeste also stated that she was going to immediately contact the Federal Prosecutor and turn over the case to them. Christine Celeste had experience as a Special Assistant US Attorney from 2008 -2012 and was well acquainted with the people at the US Attorney's Office (USAO). ASA Celeste then informed us that she wanted to drop the charges on apparent distributor George Lee because she did not want anything to interfere with Griffin's prosecution.

Immediately upon hearing the "not to prosecute" decision, members of my squad and I protested. There was a very strong case against George Lee with the probable cause, arrest, evidence, and documentation in order and all previously coordinated with the States Attorney's Office (SAO). If the case against George Lee did not proceed, he would not have to answer for being Jimmie Griffin's heroin supplier. In addition, I was vulnerable to a civil suit from George Lee for any claims associated with a false arrest. As for the civil suit, ASA Celeste assured me I had nothing to worry about and that she would be fully supportive of me if George Lee took any civil legal action.

The charges against George Lee were dropped and he did file a civil law suit for $1.5 million against Det. Romeo and me for false arrest, malicious prosecution, battery and civil rights violations. The case went to trial on October 26, 2016 before Judge Nance and a jury. The outcome of the 3-day trial was a judgment against Mr. Lee which completely exonerated Det. Romeo and I of all civil claims and monetary damages.

It is noteworthy that George Lee testified he: knew Jimmie Griffin for about two years; was at his house on November 5, 2014; and, met with him about a week prior to that at Valentino's Restaurant. At my trial, Jimmie Griffin committed perjury by denying he ever knew George Lee.

I felt as though my squad members and I made a significant contribution to society by getting drugs and guns off the street. The actions by police against Jimmie Griffin and George Lee were properly carried out and I never heard of any complaints of distrust against the police from people in the surrounding communities. However, unknown to me at the time, this police effort was being undermined by the political forces taking shape in Baltimore City.

> Sincerely,
> Daniel Hersl

**Open Letter to the Maryland State Commission to Restore Trust in Policing (A.K.A. Ferguson Commission)**

**From: Daniel Hersl**

**Letter: 023 – Jimmy Griffin (Criminal Justice Evolves in Baltimore)**

**Date: January 26, 2020**

**Dear Commissioners:**

As I mentioned in the previous letter, I thought it was Assistant State's Attorney (ASA) Christine Celeste's decision not to prosecute George Lee. But now I realize that the US Attorney's Office (USAO) was in charge of the case. If the USAO made the decision to prosecute Jimmie Griffin, the violent heroin distributor, it was also their decision to NOT prosecute George Lee, the heroin supplier.

Why did the Feds not want to prosecute Mr. Lee when the Baltimore Police Department (BPD) had a tight case against him? To this day it is still puzzling as no explanation was ever given. George Lee's phone was confiscated when he was arrested. It should have been standard procedure for the Feds to process the phone and verify recent communications between the distributor, supplier, and others that may have been connected to the conspiracy of this major violent illegal drug ring. An earnest effort by the FBI and the USAO in this matter at this time could have made a major dent in the Metro Region Opioid Epidemic. But instead, Lee was never charged and repeat gun offender, Griffin, was given a plea deal with no gun charge.

Looking back on those November 2014 days, there was a change in Baltimore's criminal justice system, one that I did not realize was taking place. Why did the USAO forfeited a gun arrest? Since the early days of my career during "Project Exile" and later the "Ceasefire Program", the Feds, a partner with BPD and under Maryland U.S. Attorney Rod Rosenstein, were never known to drop a gun charge, let alone a repeat offender gun charge. That's why they took the case in the 1st place. Something was not right. The Fed's thrive on gun charges and that is what the whole Ceasefire squads were all about - making good gun cases for the USAO to prosecute. In the Jimmie Griffin case, the Feds took the gun case and then dropped it.

In addition, George Lee would have normally been prosecuted and the heroin ring would have been further investigated. After voicing my disapproval over the "not to prosecute" decision, I went back to being a street cop looking to get more guns and drugs off the street.

I further realized the criminal justice change when the Freddie Gray tragedy hit Baltimore. During the ensuing riot at the latter part of April 2015, the BPD was ordered to "Stand Down". I remember being on the front lines at Camden Yards & Mondawmin Mall being pelted by bricks, bottles, batteries and other debris. My thoughts were that this was a "well planned event" where the Police Department was being publicly humiliated as a "Punishment" for being policemen. I am not saying that is true. I am saying that is how I felt. After the riots, I again went back to being a street cop getting guns and drugs off the street.

Finally, when it was time to defend myself against George Lee's civil law suit in the latter part of 2016, my attorney subpoenaed ASA Celeste as a witness. However, instead of getting the earlier promised support from ASA Celeste, Marilyn Mosby's office filed a motion to quash her testimony based on the argument ASA Celeste had immunity and did not have to testify. It was evident to me that my good police work was being despised in the halls of justice just because I was a policeman.

Sincerely,
Daniel Hersl

**Open Letter to the Maryland State Commission to Restore Trust in Policing (A.K.A. Ferguson Commission)**

**From: Daniel Hersl**

**Letter: 024 – Jimmy Griffin (Accounting of the Money)**

**Date: February 7, 2020**

**Dear Commissioners:**

On February 1, 2018, the U.S. Attorney's Office (USAO) called Jimmie Griffin as a witness in their case against me. The USAO knew that the violent heroin distributor was not a credible witness and his story never added up over the years. Nevertheless, they gave him a get-out-of-jail-free card for his testimony against me despite the testimony of two credible policemen that contradicted Griffin's story.

Touted as a credible witness by the USAO, federal inmate Griffin testified that after I arrested him, on November 5, 2014, he pled guilty for possession of over 100 grams of heroin and has been in prison since then. Mr. Griffin also stated for the record he was a heroin distributor, had bought 4 ounces of weed for $1,000, smoked the marijuana with his friends just prior to his arrest, had a 2012 gun conviction, and possessed a gun at the time of his 2014 arrest.

The USAO asked Jimmie Griffin to account for the money in his possession prior to his arrest. Jimmie Griffin stated he received $10,000 from his cousin, Tyrone Creighton, also a drug dealer, sometime within a week of Griffin's arrest (Transaction a). The money was in cash and was believed by Griffin to be lead paint settlement money or drug profit proceeds obtained by Creighton.  In addition, Jimmie Griffin testified that he received $6,000 from his Aunt Samara Reynolds (Tyrone Creighton's mother) on the day of arrest (b). Again, Griffin testified the money from his aunt was in cash and was believed to be lead paint settlement money or drug profit proceeds which she was given by her son Tyrone Creighton.

At about noon time, on the day of his arrest, Griffin said he went down the street on Belair Road and purchased a car for $3000 (c). Afterwards he purchased 4 ounces of weed for $1,000 (d). This left him with $12,000 of which he says $5,000 was left in the safe at home, $1,000 was left in his drawer at home, and $6,000 was on his person.

| ID | Transaction | Date | Credit | Debit | Balance |
|----|-------------|------|--------|-------|---------|
| | | | | | 0 |
| a | From Creighton | Before 11/5/14 | $10,000 | | $10,000 |
| b | From Aunt Reynolds | 11/5/2014 | $6,000 | | $16,000 |
| c | Car Purchase | 11/5/2014 | | $3,000 | $13,000 |
| d | Weed | 11/5/2014 | | $1,000 | $12,000 |
| e | George Lee ??? | 11/5/2014 | | $8,500 | $3,500 |
| Jimmie Griffin's Approximate Account of His Money on Day of Arrest | | | | | |

As I reported in letter 020 and 021, $4,003 was confiscated from the safe at Jimmie Griffin's house and $900 was seized from his pocket during arrest for a total of $4,903. However, nearly two and a half years later, sitting in a federal prison, Jimmie remembers he had $6,000 in his pocket instead of $900 and $6,000 in the safe at home instead of $4,003. At the time of arrest, Jimmie never claimed it was his safe or his money in the safe at his home. However, at my trial Jimmie claimed he was $7,097 short and accuses me of taking it.

What Jimmie Griffin hid from the jury was that he had a two year relationship with his apparent drug supplier, George Lee, and Mr. Lee left Jimmie's house with $8,500 (e) hours before Jimmie's arrest. Under oath, Jimmie claimed HE DID NOT KNOW GEORGE LEE thereby hiding the fact he gave George Lee $8,500. If Jimmie would have been truthful, his numbers would show he had approximately $3,500 instead of the $12,000 that he claimed. In summary, the numbers speak for themselves. I did not take Mr. Griffin's money. The money was given to George Lee.

Sincerely,
Daniel Hersl
