# EXHIBIT F

REPORT ON OVERTIME

AT THE

BALTIMORE POLICE DEPARTMENT

Issued By the Department of Finance
City of Baltimore
October 24, 2018



# TABLE OF CONTENTS

Background on Overtime at the Baltimore Police Department ................................................................ 3

Overtime Findings ...................................................................................................................................... 4

Conclusion: Short and Long- Term Recommendations......................................................................8

## BACKGROUND ON OVERTIME AT BPD

The chart to the right reflects overtime costs at the Baltimore Police Department ("BPD") over the last five fiscal years, and it shows how those costs have increased every year since 2013:

| Fiscal Year (FY) | Overtime Spend |
|---|---|
| FY 2013 | $23.2 million |
| FY 2014 | $29.6 million |
| FY 2015 | $37.2 million |
| FY 2016 | $43.6 million |
| FY 2017 | $47.1 million |
| **Total** | **$180.7 million** |

The overtime figures, however, must be understood in the following context. First, some BPD overtime is reimbursed, in full or in large part, by third-parties like the Maryland Stadium Authority, Johns Hopkins Hospital or other third-parties. If the overtime goes away, the funds to pay that overtime also go away.

Second, BPD officers receive "overtime" under the Memorandum of Understanding ("MOU") between BPD and the Fraternal Order of Police ("FOP") if their schedule is changed or if a leave day is cancelled. This kind of "overtime" is actually penalty pay; even though it is called "overtime" under the MOU, it does not indicate that any additional hours were worked. Thus overtime spend is not all attributable to additional hours worked.

Third, it is not necessary for an officer to have worked 40 regular hours before becoming eligible for overtime pay.

 • Under the MOU, overtime eligibility is determined on a daily basis (not a weekly basis), meaning an officer is eligible for overtime if he/she works beyond his/her regularly scheduled shift regardless of the total hours worked in the week.

 • Under the MOU, paid time off is counted as time worked and applied toward the overtime threshold.

Therefore, if an officer is on vacation all week but makes a four-hour court appearance, the four hours of court time is paid as overtime even though the officer worked no other hours during the work period. Similarly, if an officer takes a week's vacation and then volunteers to work a full week, that officer would earn time-and-a-half on the 40 hours worked during vacation, and also be paid for the vacation time. Thus, standing alone, BPD's gross overtime figures do not reflect an officer's actual work burden and cannot be used alone as criteria to determine if officers are working unreasonable numbers of hours.

Fourth, although overtime concerns have sometimes focused on patrol staffing shortages, overtime costs at BPD are not overwhelmingly attributable to patrol. Of the 25 highest overtime earners at BPD in FY 2017, approximately 40% were assigned to duties other than patrol.

3

TIME AND ATTENDANCE & OVERTIME FINDINGS

BPD lacks internal controls that would allow the Department to ensure that officers are working all of the regular hours for which they are paid, as well as to ensure that any overtime hours are necessary, appropriate and actually worked when recorded.* BPD is operating at an unsatisfactory level in virtually every area governing the documenting, monitoring and supervision of attendance and overtime. That failure to maintain appropriate controls over overtime expenditures begins with the lack of appropriate policies to govern overtime and the failure extends through a lack of enforcement of the few controls that do exist.

There are three primary reasons why BPD's controls are inadequate:

      (1) a lack of command accountability and resistance to change;

      (2) barriers to effective monitoring and supervision; and

      (3) BPD's reliance on manual systems/lack of technology.

      **Reason #1:** <u>Lack of Command Accountability and Enforcement</u>

Multiple BPD commanders have stated a view that it is impossible to simultaneously engage in effective policing and also enforce reasonable overtime controls. That perspective assumes that all overtime is necessary, appropriate and deployed effectively. BPD command has acknowledged that an enormous cultural shift would be necessary to reduce overtime costs, with many commanders noting the dependence that many officers have on the extra income generated by overtime. There have been prior initiatives to control overtime made by multiple commissioners who served under multiple mayors. BPD command has observed those efforts were often stopped and then re-started as the Department's attention to overtime waxed and waned, and as external pressure increased or decreased. At times, BPD has described the situation as a binary choice between having overtime controls or effectively addressing crime, and that both could not occur simultaneously.

The perception that overtime is a blank check limits accountability. The adoption of overtime controls that allow overtime when it is necessary and appropriate, but that prevent overtime when it is <u>not</u> necessary and appropriate, should reasonably have no adverse impact on effective policing. BPD currently does not have reasonable controls to ensure that overtime expenditures are necessary and appropriate.

---

* This Report expresses no view on operational issues, including whether BPD has deployed the proper number of officers to patrol or whether it is using its officers effectively while on duty. Instead, this Report is focused on whether BPD has controls in place that would allow BPD to limit overtime expenditures to those overtime hours that are reasonable, necessary and that the overtime recorded and paid was actually worked.

4

In fact, BPD's attendance policies and practices do not ensure that BPD officers actually work the *regular* hours for which they are paid. For example:

    • Attendance is taken at the start of a shift, and officers are marked present for the full day, even if an officer leaves before the end of the shift or arrives late. Timekeepers interviewed could not recall an instance when officers were required to use leave when they worked fewer hours than scheduled.

    • While extra hours worked are recorded on overtime slips, BPD has no mechanism for tracking instances where officers work less than a whole day. Units do not record the actual start and stop times of officers; interviewees stated that failure to work a full day (by arriving late or leaving early) would be addressed as a disciplinary matter if there was a chronic problem, but it would not affect an officer's pay or leave.

    • Multiple commanders acknowledged the practice of awarding a paid day off without requiring an officer to work and without requiring use of an accrued leave day. Multiple commanders tried to justify the practice by arguing it was a necessary motivational tool.

    • At least one specialized unit is known to begin its work day at the gym exercising and then continue its day with unstructured and self-initiated practice exercises.

    • Non-patrol officers who are paid to work eight hours and 21 minutes per day, in practice, work only eight hours per day (including a paid lunch). An additional 21 minutes worked five days per week by the roughly 1,100 BPD officers assigned to non-patrol duties would have resulted in officers working approximately 100,000 hours more annually which equates to approximately 46 Full Time Equivalent positions.

BPD's lack of reasonable controls over ordinary time and attendance standards also extends to BPD's management of overtime. During much of the period under review, overtime was governed by BPD General Order 6-87, which was effective from 1987 until Spring 2018. General Order 6-87 noted that commanders have a duty to control overtime costs, required overtime report forms, and stated that when completing an individual overtime report form, "the authorizing supervisor requesting the overtime shall sign in the appropriate space; and the supervisor on duty, when the work is completed, shall sign as the certifying officer."

BPD command knew and understood the overtime policy requirements, including the meaning of authorizing and certifying signatures. However, the overtime policy requirements have been regularly ignored in practice, with officers being paid for overtime based on overtime slips that violated the authorizing and certifying requirements. More specifically, overtime slips were approved and signed by officers who were not of a higher rank (e.g., sergeants signed overtime slips for other sergeants) and overtime slips were signed by officers who had not been in a position to supervise or verify the work (and who might work in an entirely different unit).

Similarly, the Office of Professional Responsibility (OPR) did not hold officers accountable for overtime abuses throughout the review period. When asked about the failure to enforce overtime policy requirements, OPR's former leadership took the position that General Order 6-87 was too vague to enforce compliance because the meaning of authorizing and certifying was unclear. OPR also suggested that, because officers historically had not been held accountable for following the requirements of the overtime policy, officers could not be held accountable prospectively. Notably, despite voicing a view that the General Order 6-87 was too vague to require compliance (a view not confirmed by any other commander), OPR identified no effort it undertook to clarify the policy or to educate officers so that OPR would feel comfortable making officers accountable for compliance.

The lack of sustained commitment to adopting and enforcing reasonable controls is also evident in the on/off progress BPD exhibited earlier this year. In an apparent acknowledgment that the then-current overtime policy provided inadequate controls, on March 14, 2018 former Commissioner De Sousa published a new overtime policy that was to have an effective date of March 18, 2018. The new policy strengthened the procedure for obtaining preauthorization for overtime and included additional language regarding the responsibilities of officers and supervisors. However, several days after the new policy was circulated within BPD, Commissioner De Sousa announced via email to all BPD members that policy enforcement would be stayed due to objections from commanders and officers, stating:

> the [new] policy will be implemented incrementally to give both members and command time to adjust to the new requirements. While the policy will remain in effect, no one will be disciplined for violations until I am satisfied that all members and command have had sufficient time to adjust to the new requirements.

Two months later, Commissioner De Sousa resigned, without having implemented the policy, "incrementally" or otherwise, and without having issued a subsequent memo to advise BPD members when the new policy would be enforced. The uncertain status of the new policy continued through the preparation of this report.

**Reason #2 :**   Barriers to Effective Monitoring and Supervision

The circumstances under which officers may be required to work overtime vary from one unit to another. In general, time and attendance (including overtime duties) are subject to greater supervision within the Patrol Division. There are multiple controls in place allowing for increased accountability of patrol officers, including reporting to district stations where senior commanders may be present and standard roll calls. Patrol officers also perform their duties while driving marked police cars, which are not taken home and must be checked in and out at the beginning and end of shifts. Additionally, if a patrol officer failed to respond to a radio call, their absence would be noted by dispatch and/or supervising command. These greater opportunities to exercise control extend to patrol overtime, regardless of district.

In contrast to patrol units, there are many fewer opportunities for adequate supervision of time and attendance (including overtime) in many non-patrol units. Many of these units report to isolated locations, away from the districts or BPD Headquarters (HQ). Those units have varying levels of direct supervision on a daily basis. For example:

- Various investigative units historically have worked out of district police stations, but report to commanders who were located at HQ.

- The Bomb Squad Unit and the Marine Unit report daily to a location in Canton.

- The K-9 Unit reports to Druid Hill Park.

- The Mounted Unit reports to a barn several blocks from HQ.

- The Aviation Unit reports to Martin Airport in Middle River.

- A number of BPD officers report to federal, state, or local task forces that are not directly supervised by any BPD personnel (e.g., some report to locations in Baltimore County).

- Even non-patrol officers who report to a HQ location often do not have higher level supervisors present who are in a position to supervise and ensure regular daily attendance, since a captain or major may be responsible for units at multiple locations.

Accountability is particularly challenging within investigative units, where officers may have unmarked take home cars. Even when non-patrol officers report to a defined location, commanders often have limited visibility into the specific working hours of officers under their command because the demands of the job may require irregular hours (e.g., investigators in homicide). It appears to be logistically infeasible to have a senior commander (e.g., a captain or major) reporting physically to each of the disparate locations from which non-patrol officers work. As a result, attendance and monitoring of hours worked for these units may have little opportunity for supervision from command above the level of a sergeant or lieutenant. Supervision of time and attendance by sergeants and lieutenants is important; however, this lower level supervision is insufficient when senior commanders are not available to supervise the sergeants and lieutenants. If commanders cannot be physically present at these reporting locations, technology to confirm time and attendance becomes even more critical. BPD commanders who wish to closely monitor the time and attendance of remote units currently lack reasonable technological tools to do so.

**Reason #3:**     Paper Intensive Manual Systems/Lack of Technology

The current electronic timekeeping system maintains time and attendance on an "exception basis." This means the system is pre-programmed to record an officer as present and to pay that

officer for his or her entire scheduled shift, unless a timekeeper manually intervenes to change the officer's schedule within the system.

The paper roll books, used by some patrol units and by all non-patrol units currently, are unreliable sources for making the appropriate adjustments in the electronic timekeeping system.

Those roll books are intended to record attendance and are to be completed by the officers' immediate supervisor and are supposed to be signed daily by those supervisors. However, the roll books reviewed do not record specific arrival and departure times of each officer. Instead, roll books are merely marked with a notation intended to indicate that an officer was present at work. Moreover, it is apparent from the white-out and the erasures that the attendance markings in the roll books are not always recorded contemporaneously.

Civilian personnel are assigned as unit timekeepers, with responsibility for updating officer schedules in the electronic timekeeping system. The timekeepers are required to make updates in the payroll system using (i) the paper roll books reflecting daily attendance, (ii) paper leave slips documenting absences, and (iii) paper overtime slips recording additional hours. While the paper documentation is required to be reviewed and signed off on by a supervisor these paper records often provide conflicting information that must be reconciled by the timekeeper. The possibility for error or fraud is significant in such a paper intensive process.

In addition, because the manual processing of overtime slips requires multiple approvals, timekeepers cannot enter overtime in real-time and commanders cannot view it in real time. Commanders often do not learn about the details of overtime until days or weeks after it has been worked. This hinders the ability of commanders to control the amount of overtime worked; it also hinders their ability to verify the work was necessary and actually completed. The Police Commissioner and command staff should have access to electronic data that provides real-time time confirmation of attendance and hours of work, including overtime information that at a minimum can be sorted by officer, by assignment, and by overtime justification.

## CONCLUSION: SHORT TERM AND LONG TERM RECOMMENDATIONS

In summary, to date, BPD has not implemented sufficient internal controls to: 1) document and monitor attendance, and 2) ensure that overtime expenditures are necessary and appropriate, and to prevent overtime waste, fraud or abuse.

### Recommendations- Short-Term Recommendations - Attendance

- BPD should improve its time and attendance policies. Among other things, BPD should: (1) require attendance of all officers (other than task force members who report to a non-BPD location) at a daily BPD roll call; (2) require standardized documentation (forwarded weekly to BPD Fiscal) by supervisors for each officer who is absent from roll call for work-related reasons and who will be recorded as present in the roll book; and (3)

8

require supervisors to record specific times in and times out for each officer in the roll book.

- Officers often prefer to take vacation or other kinds of leave, in lieu of sick leave, because they receive eight (8) extra days off as "medical incentive days" for not taking sick leave in a calendar year. Given BPD's personnel shortage, BPD typically must cover medical incentive days off through the overtime. BPD should deny officer requests to use vacation and floating holidays to cover last minute absences that are precipitated by medical reasons. Instead, it should require those officers to use available accrued sick time.

- BPD should issue a policy that prohibits the awarding of paid days off without the use of accrued leave.

## Recommendations- Short-Term Recommendations - Overtime

- A critical first step to implementing appropriate internal overtime controls is to define expectations for officers and commanders in an overtime policy, and to hold individuals accountable for following that policy. BPD currently is reviewing and re-issuing a new overtime policy intended to require advance approval for most kinds of overtime.

- Officers bid for their leave days in the first quarter of the calendar year pursuant to the MOU. After the leave bidding is completed, and vacations are assigned, supervisors should be restricted from granting additional (or changed) vacation days that must be filled by overtime. BPD should consider requiring higher level command approval for this kind of leave. Relatedly, BPD should require regular reporting to BPD Fiscal by the supervisor approving leave whenever non-exempt officers are granted vacation leave after February leave bidding is closed.

- BPD should install appropriate time stamps in every location where BPD officers report to work and require officers to date and time stamp their overtime slips in accordance with the new overtime policy.

- BPD should require timekeepers and supervisors to review documentation attached to overtime slips to ensure completeness and compliance with the new overtime policy. Empower timekeepers to question and/or return overtime slips that are incomplete or questionable. The Department should hold timekeepers and supervisors accountable.

- Disciplinary measures should be implemented for supervisors who are noncompliant with overtime policies.

- The Department should implement in-service training modules that address the supervision of overtime (including an overview of the policy, monitoring, and

disciplinary measures) and budget management (understanding a budget, managing to a budget). These modules should be required for all supervisory ranks of sergeant and above and should be required at promotion and yearly thereafter.

- Individual commanders should be required to monitor their command overtime through regular reporting and measuring of daily, weekly and bi-weekly targets for each section/unit by total overtime spent and % of total expended. At a minimum, monitoring of variances over budget should require documentation of justifications for the over-spend and intended corrective actions, as appropriate.

- BPD should create an internal audit function to perform standardized periodic (e.g., monthly, quarterly) risk-based audits of overtime (e.g., of high overtime earners, specialized units) on a sample basis. The auditors should function pursuant to written Standard Operating Procedures that identify the analyses to be undertaken during each review, required follow-up steps, and a procedure to be followed for the reporting of questionable entries or concerns, including any confidentiality requirements. Among other things, those audits should verify that (1) overtime slips comply with the requirements of the overtime policy; (2) sign-offs by supervisors and commanders are genuine and appropriate; (3) any documentation attached is consistent with the overtime claimed; and (4) overtime recorded actually was worked (e.g., by reviewing Maryland Judiciary case search to verify court appearances, Arrest Viewer to verify arrests, Evidence Control records that show the processing of evidence, etc.). The overtime auditors should be civilians working out of BPD Fiscal rather than sworn (or retired sworn) members of the Department. As they are completed, the results of each periodic investigation should be provided to BPD Fiscal, the Commissioner and the City's Department of Finance.

## **Recommendations- Long-Term Solutions**

The Department of Finance also supports the prompt adoption of technological solutions to resolve the two-fold problem with overtime at BPD: the lack of available information about overtime that would allow more efficient use of BPD personnel, and the lack of controls to limit overtime waste, fraud and abuse.

BPD lacks a comprehensive way to determine which officers are working in which district on any given day. Each officer is assigned to a locator number which reflects, in theory, where he or she is assigned. However, those locator numbers do not necessarily reflect actual assignments because officers on one assignment can be detailed to a different assignment, because officers can be on leave (extended or otherwise), or because officers are assigned to administrative or light duty (either because of medical or disciplinary reasons).

In fact, the first electronic record of an officer's overtime is created when the timekeeper enters the overtime slip in the payroll system for payment, which happens days or sometimes weeks

10

after the overtime was worked. No tool exists to allow the Police Commissioner to see daily how many officers were absent in which districts, which districts had unexpected overtime, and which officers stayed beyond the ends of their shifts. The lack of real-time information is detrimental to command's ability to control overtime expenses and to ensure accountability.

Therefore, it is recommended that BPD:

● Install biometric timeclocks at all BPD locations where officers are assigned, and require biometric scanning of arrival and departure times at each officer's assigned location for regular shifts.

● Implement and mandate use of a global positioning system (GPS) that allows limited use of electronic time in/time out using mobile biometric identification (e.g., fingerprints) but *only* for certain highly defined instances of pre-approved overtime (e.g., if a homicide detective is called in from home by his or her supervisor to report to a crime scene).

● Require GPS tracking of all BPD unmarked take-home vehicles as an additional control for monitoring time and attendance, as well as for increasing public accountability (this also provides a significant safety benefit for officers using those vehicles).

● Implement a scheduling and time and attendance tracking system. Such a system can assist BPD in forecasting, recording and allocating overtime and would serve as a valuable tool. However, the tool is only as valuable as the time and input provided by BPD during the planning and implementation phase. Agency involvement is critical, for example, BPD must make decisions about what rules will be programmed into the system to guide overtime allocation, the approval workflow for overtime, etc. If implemented properly and required for all BPD officers, this kind of system would provide the Commissioner and commanders with important real-time insight into the daily deployment of BPD members throughout the department and would provide audit trail documentation for monitoring and compliance reviews.

In conclusion, the efforts of BPD to develop and implement a framework that increases internal controls, promotes accountability, and ensures fiscal integrity is a phased process that requires both short term actions and sustained long range planning. Implementation of immediate initial steps will increase control of overtime spending and move BPD toward optimized internal controls.