**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO. GLR-17-0106-03** |
| **DANIEL HERSL,** | |
| **Defendant.** | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S EMERGENCY MOTION FOR**
**COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582**

Defendant Daniel Hersl ("Hersl" or "defendant") robbed citizens of Baltimore while serving as a Baltimore City Police Detective. On February 13, 2018, a jury convicted Hersl of a Racketeering Influenced Corrupt Organization ("RICO") Conspiracy, substantive RICO charges, and Hobbs Act Robbery. On June 22, 2018, the Honorable Judge Catherine Blake sentenced Hersl (then 48 years-old) to an 18-year prison sentence. *See* ECF No. 442. Hersl has served 6 years and 8 months, or 37%, of that sentence. Hersl continues to deny responsibility for his crimes. *See* ECF Nos. 615, 638, 645, 652, 662, 685, 703, 748.

On October 17, 2023, Hersl filed an Emergency Motion for Sentence Reduction pursuant to 18 U.S.C. § 3582(c), due to metastatic prostate cancer. Although the United States concedes that the defendant's diagnosis makes him eligible for release, the Court should deny the Motion.

In evaluating a motion for compassionate release, the Court must consider not only the defendant's diagnosis, but also the sentencing factors in 18 U.S.C. § 3553(a), and those factors do not warrant an early release. The defendant used his badge and his gun to betray the public trust. Not only did Hersl harm the victims he robbed, but he also tarnished the criminal justice system in Baltimore City. His crimes resulted in the dismissal of hundreds of criminal cases, and his conduct strained an already-tense relationship between Baltimore City citizens and their Police

1

Department. Additionally, Hersl's six years of incarceration have not been rehabilitative. Hersl expresses no remorse and does not accept responsibility for his crimes. He should not be released.

## I.    FACTUAL AND PROCEDUREAL BACKGROUND

### A.    <u>Summary of Defendant's Conduct</u>

Hersl joined the Baltimore City Police Department ("BPD") in 1999. *See* Hersl Pre-Sentence Report ("PSR") at 5. As a Detective in the Eastern District in the mid-2010s, Hersl robbed multiple civilians whom he detained while on police duty. *Id.* Hersl's position and status as a police officer were part and parcel to these offenses and his concealment of them. Hersl robbed these citizens as part of purported police operations, and he used official BPD reporting mechanisms to cover up his crimes and obstruct justice.

In December 2015, Hersl joined BPD's Gun Trace Task Force ("GTTF") – a unit ostensibly targeting guns and violent criminals. But there, Hersl joined with other GTTF members to continue robbing civilians whom they detained (and sometimes arrested) while on police duty. Hersl also conspired with his fellow GTTF members to commit overtime fraud and inflate the wages they received from the City.

### B.    <u>The Charges, The Evidence, and The Verdict</u>

On June 22, 2017, a grand jury charged the defendant in a six-count Superseding Indictment with:

- Count 1 – Racketeering Conspiracy, in violation of 18 U.S.C. §§ 1962(d) and 1963;

- Count 2 – Racketeering, in violation of 18 U.S.C. §§ 1962(c) and 1963;

- Count 5 – Hobbs Act Robbery, in violation of 18 U.S.C. § 1951(a); and

- Count 6 – Possession of a Firearm in Furtherance of a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A)(i).

ECF No. 137.  Hersl's co-defendants – Momodu Gondo, Evodio Hendrix, Wayne Jenkins, Jemell Rayam, Marcus Taylor, and Maurice Ward – were all fellow GTTF members.

Hersl and Taylor went to trial after all other co-defendants had pleaded guilty. After a twelve-day trial in January and February 2018, the jury found Hersl guilty of Counts 1, 2, and 5. The jury also convicted Taylor of Counts 1, 2, and 3 of the Superseding Indictment.

In the Verdict Form, the jury found that Hersl robbed victims both before and after he joined the GTTF. *See* Verdict Form, ECF No. 342. Specifically, the jury found that Hersl committed at least three robberies as a BPD detective before December 2015:

- ***Robbery of Jimmie Griffin on November 5, 2014 (Racketeering Act 3)*** On November 5, 2014, Hersl robbed Jimmie Griffin of $7,097. Hersl was armed with his BPD service weapon and wore body armor in his BPD police vest when he robbed Griffin. That day, BPD arrested Griffin in the backyard of a home on Evesham Avenue in Baltimore City; Hersl searched Griffin while he was physically restrained with handcuffs. Griffin had $6,000 in his pocket. Hersl took all $6,000, giving $900 to another BPD Detective to submit to the Evidence Control Unit and keeping the remaining $5,100. Mr. Griffin also had $6,000 at his home. Hersl only turned in $4,003 to Evidence Control, keeping the remaining $1,997 for himself. *See* PSR at 5.

- ***Robbery of Herbert Tate on November 27, 2015 (Racketeering Act 4)*** On November 27, 2015, Hersl robbed Herbert Tate in the 2000 block of Robb Street while Tate was physically restrained with handcuffs. Hersl was armed with his BPD service firearm and wore body armor in his BPD police vest. At the time of his arrest, Tate had $530 in cash on his person that he had made working as an HVAC technician. Hersl stole $314 and submitted the rest to BPD. Hersl falsely claimed in a statement of probable cause that Tate

had placed a bag containing heroin gel caps on a retaining wall at the north end of Robb Street immediately before his arrest. In fact, Tate was not engaged in any illegal activity prior to his arrest. *See* PSR at 5.

- ***Robbery of Antonio Santiful on November 28, 2015 (Racketeering Act 5)*** Only one day after robbing Tate, on November 28, 2015, Hersl robbed Antonio Santiful on Aiken Street while Santiful was physically restrained in handcuffs. Hersl was armed with his BPD service firearm and BPD vest when he robbed Santiful. Santiful had approximately $700 on his person that he had made cleaning office buildings. Hersl stole approximately $500 and submitted $218 to the BPD. Hersl falsely claimed in a statement of probable cause that he had seen Santiful engage in a drug transaction prior to his arrest. *See* PSR at 5.

Hersl's criminal conduct continued after he joined the Racketeering Conspiracy with his fellow GTTF members. The jury found that Hersl committed the following acts of robbery and overtime fraud as a member of the GTTF:

- ***Robbery of Ronald and Nancy Hamilton on July 8, 2016 (Racketeering Act 10):*** On July 8, 2016, Hersl and fellow GTTF members executed a search warrant at Ronald and Nancy Hamilton's Westminster, Maryland home. Hersl physically restrained the victims when they were robbed, and he was armed with his BPD service weapon and body armor in his BPD police vest.  During the search, Hersl and fellow GTTF members stole more than $20,000 and a watch valued at several thousand dollars. Before the money could be split up among the members of the conspiracy, Hersl stole $3,000. GTTF members then split the remaining $17,000 at a bar in Baltimore. Neither Hersl nor any other members of the GTTF who participated in the search disclosed to BPD or other authorities that they had stolen over $20,000. *See* PSR at 6.

4

- ***Time and Overtime Fraud (Racketeering Acts 14, 15, 18, and 21 – Wire Fraud)*** In addition to the robberies, the jury also found that Hersl committed wire fraud through his routine submission of false individual overtime reports. On these reports, Hersl falsely certified that he worked his entire regularly assigned shift, when he did not, and that he worked additional hours for which he received overtime pay, when in truth, he had not worked all and in some cases any of those overtime hours. Hersl submitted false overtime reports for himself and for his GTTF member co-defendants, with their knowledge and at their direction. His co-defendants also did the same on his behalf. Hersl and the GTTF's fraud followed a familiar pattern: if a sub-set of the GTTF had a gun arrest, all members of the GTTF, regardless of whether they had actually participated in the arrest, would submit individual overtime reports. On some occasions, this occurred when Hersl and his co-defendants were not working at all on the day of the claimed arrest. In that circumstance, it was necessary for one of his co-defendants to submit the individual overtime report for Hersl, or for him to do it for one or more of them. In submitting false and fraudulent individual overtime reports, Hersl acted with the intent to defraud the BPD and the citizens of the State of Maryland. *See* PSR at 7.

**C. Sentencing**

Following Hersl's conviction, the Honorable Catherine Blake sentenced Hersl to 18 years' imprisonment and further ordered him to pay $27,893 in restitution. *See* Amended Judgment, Dkt. 729. In providing her well-reasoned explanation for the sentence, Judge Blake thoroughly reviewed the factors under 18 U.S.C. § 3553(a). The sentencing transcript is publicly available at ECF No. 477, but the Government is also attaching as Exhibit 1 an extract that contains Judge Blake's remarks.

As to the nature and circumstances of the offense, Judge Blake noted the individual harms caused by Hersl's abuse of power, stating, "there are harms to the individual victims whose money was taken. There was undoubtedly a wrongful use of official force. The gun and the badge enabled taking money . . . Officers take an oath to uphold the law. That gives them the right to have that gun and that badge so they can enforce the law, not break it." Exhibit 1 at 80. Judge Blake also noted the broader harm caused by Hersl's conduct, stating that "the harm that's done to what's already a level of distrust between many in our community and the police is only deepened by these kinds of proven crimes." *Id.* Hersl's conviction and that of his other GTTF members also caused the dismissal of hundreds of other criminal cases. *Id.* As to Hersl's overtime fraud, Judge Blake stated that Hersl "took money from a city that doesn't have any money to spare." *Id.* at 80-81. Judge Blake also highlighted that Hersl's conduct "made more difficult the job of the majority of the men and women in uniform here in the city who face danger and hardship every day trying to protect the public, and they do that now in the face of this increased lack of trust." *Id.* at 81. Judge Blake concluded, "it strikes at the foundation of our entire criminal justice system if judges and juries can't rely on the word of sworn law enforcement officers because they're covering up their own crimes . . . we have very, very serious offenses here." *Id.*

As to the factors listed in § 3553(a)(2), Judge Blake stated, "to reflect the seriousness of the offense and promote respect for the law and provide just punishment, I again say there must be a significant period of incarceration." *Id.* at 82. Judge Blake added, "There must be a clear message that officers who break their oaths by robbery, by fraud, by other crimes will be prosecuted and will be justly punished for that conduct." *Id.* at 82.

Judge Blake also crafted the defendant's sentence in a way that eliminated unwarranted disparities between GTTF members with similar conduct. Specifically, she sentenced both Taylor

6

and Hersl to 18 years' imprisonment. Judge Blake reasoned that Hersl "apparently has committed a relatively similar number of robberies with Mr. Taylor" and that "there was some indication of drug involvement as to both Mr. Hersl and Mr. Taylor," but not at the level of some of the co-defendants that received higher sentences. *Id.* at 82-83. Indeed, the Government also noted at the sentencing hearing that "the most relevant comparison is to Taylor." *See* ECF No. 477 at 52-53.

### D. **The Defendant's Incarceration**

#### i. *The Defendant's Requests for Compassionate Release*

The defendant has requested compassionate release twice before due to cancer. His first request was in April 2023 following his prostate cancer diagnosis. *See* April 2023 Request, attached as Exhibit 2. In that request, Hersl claimed that he was "one of the highest decorated officers in [the Baltimore City Police Department's] history." *Id.* The Warden denied the request because Hersl did not meet the medical criteria for compassionate release. *See* June 2023 Warden Letter, attached as Exhibit 3.

Hersl made another request in August 2023, when it was discovered that his cancer had metastasized. *See* August 2023 Request, attached as Exhibit 4. The Warden denied the request, stating:

> While you meet medical criteria, the other factors under the program statement are reviewed as well. You have served roughly 36.5% of your imposed sentence. Consideration of an early release would mitigate the seriousness of your sentence in consideration of time served. The nature of the offense is also considered. You greatly abused a position of public trust. Consideration of an early release would minimize the severity of your crime, which includes victims.

*See* Sept. 2023 Warden Letter, attached as Exhibit 5.

#### ii. *The Defendant's Disciplinary Record*

In his Compassionate Release Motion, Hersl claimed that he "has been incarcerated without any infractions since March 1, 2017." ECF No. 790 at 2. This is not true. Hersl has had

two infractions while in BOP custody; one in 2020 for refusing to obey an order and one in 2022

for disruptive conduct.  *See* Hersl Inmate Discipline Data, attached as Exhibit 6.

                *iii.   The Defendant's § 2255 Motion*

      On November 4, 2020, Hersl filed a motion pursuant to 28 U.S.C. § 2255 seeking to vacate

his sentence.  ECF No. 615.  Hersl cited the following six "major circumstances that contribute to

Hersl's unjust conviction":

    I.   Prosecutorial/FBI assisted investigation was compromised and illegal
    II.   Indictment handed down from the grand jury is overwhelmingly suspect
    III.   Ineffective assistance from Counsel,
    IV.   Prosecutorial misconduct
    V.   Internal information leaks to the public from the prosecutorial team
    VI.   Judicial interference

*Id.* at 1.  In his Motion, Hersl claimed that he is "innocent" and referred to his conviction as

"wrongful" and "unjust."  *Id.*

      At trial, Hersl's defense strategy was to admit that a theft occurred, but deny that robbery

occurred, because theft is not a predicate act under RICO.  As to this strategy, Hersl wrote in his

§ 2255 Motion:

> During court proceedings, including the opening and closing statement, Counsel
> commented that the Defendant admitted to taking money as an act of theft.  This
> statement is false, and was stated without the written or verbal consent of the
> Defendant.  The Defendant did not admit to taking money from any of the victims
> portrayed in the trial.  Such a statement by Counsel caught the Defendant off guard
> and at the same time created a damaging perception inside the courtroom that "The
> Defendant steals money".  Whatever Counsel's reason for making the statement, it
> was ineffective as it "poisoned" the minds of jurors thus having plausible effect on
> the trial outcome.

*Id.* at 22.  In this passage, Hersl denies stealing any money from his victims.  Hersl filed a number

of supplements to his motion where he maintains his innocence.  *See* ECF Nos. 638, 645, 652, 662,

685, 703, 748.

### E.  Victim Notification

The Victim/Witness Unit for the U.S. Attorney's Office has mailed a notice of the defendant's Motion to the defendant's victims.  As of this filing, this Office has not received a response from any victim, although the Government only had two weeks to respond to the Motion, and the victims had even less time to respond to the notice.  Undersigned counsel will notify the Court if any response is received.

## II.    COMPASSIONATE RELEASE FRAMEWORK

### A.  Exhaustion of Administrative Remedies

Section 3582(c)(1)(A) requires a defendant to pursue his or her administrative remedies with the Bureau of Prisons (BOP) by first presenting the request to his or her warden before seeking judicial relief; only then is the court authorized to consider a defendant's § 3582 motion. *See* 18 U.S.C. § 3852(c)(1)(A); *United States v. Muhammad*, No. 20-7520, 2021 WL 4888393, at *2–3 (4th Cir. Oct. 20, 2021).

### B.  Extraordinary and Compelling Reasons for Relief

The Court may reduce a defendant's sentence only if it finds that "extraordinary and compelling reasons warrant such a reduction" and that the defendant is no longer a danger to the community.  18 U.S.C. § 3582(c)(1)(A).  The U.S.S.G. Section 1B1.13 states that "extraordinary and compelling reasons" for release includes a terminal illness, such as metastatic solid-tumor cancer.  *See* U.S.S.G. § 1B1.13(b)(1)A).

### C.  Danger to the Community

Next, the Court determines if the defendant is "a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(a)(2). Under this analysis, the Court considers: (1) the nature and circumstances of the offense, including if the

offense is a crime of violence or involves a minor victim; (2) the weight of the evidence; (3) the defendant's history and characteristics, including the defendant's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, record concerning appearance at court proceedings, and whether he was on release at the time of the offense; and, (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.  *See* 18 U.S.C. § 3142(g).

### D.  The § 3553(a) Factors

Finally, if the defendant has presented an extraordinary and compelling reason for relief, and is not a danger to the community, then the Court considers the § 3553(a) factors and determines whether to exercise its discretion to reduce the sentence.  *See United States v. Webster*, 611 F. Supp. 3d 194, 201 (E.D.V.A. 2020).  Often, the "danger" and § 3553(a) analyses are joined under the rubric of § 3553(a).

## III.   ARGUMENT

The United States concedes that the defendant's diagnosis meets the definition of "extraordinary and compelling" under 18 U.S.C. § 3582(c).  A terminal diagnosis is indisputably devasting news for the defendant and his friends and family.  The defendant's prognosis, however, does not end the compassionate release inquiry.  The defendant's sentence must still be consistent with the factors in 18 U.S.C. § 3553(a).  Here, the defendant used his uniform and his gun to rob victims, and he and his co-conspirators caused immeasurable damage to the criminal justice system and to the community in Baltimore City.  The defendant has expressed no remorse, and he accepts no responsibility for his conduct.  The Court should deny his motion.

10

Under § 3553(a)(1), the court is to consider the nature and circumstances of the offense and the history and characteristics of the defendant.  Courts in this circuit and others have denied compassionate release to terminally-ill patients where the nature and circumstances of the offense involved guns or violence.  *See United States v. Chambliss*, 948 F.3d 691, 694 (2020); *United States v. Webster*, 611 F. Supp. 3d 194 (E.D. Va. 2020) ("Even taken in a vacuum, the felon-in-possession charge represents a serious offense. The Fourth Circuit has explained the clear public safety interest in preventing felons, even non-violent felons, from possessing firearms."); *United States v. Clayton*, 2021 WL 2689838 (E.D.V.A. June 30, 2021); *United States v. Clark*, 2020 WL 1874140 (M.D.N.C. April 15, 2020).

Here, the nature of Hersl's crimes warrants continued confinement.  As Judge Blake stated, "we have very, very serious offenses here" that "strike[] at the foundation of our entire criminal justice system."  Exhibit 1 at 81.  Hersl abused the public trust.  *Id.* at 80.  As a police officer, Hersl was given "that gun and that badge [to] enforce the law, not break it," but instead, Hersl used his gun and his badge to rob his victims.  *Id.*  Beyond the individual victims, Hersl's conduct "only deepend" the distrust between the community and the police.  *Id.*  The conduct of Hersl and his co-conspirators further resulted in the dismissal of hundreds of other criminal cases.  *Id.* Further, his overtime fraud "took money from a city that doesn't have any to spare."  *Id.* at 80-81.  The nature and circumstances of Hersl's conduct do not justify a time-served sentence.

Under § 3553(a)(2)(A) & (B), the court is to consider the need to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, and to determine criminal conduct.  As to these factors, Judge Blake found that "there must be a significant period of incarceration."  *Id.* at 82.  On deterrence specifically, Judge Blake's 18-year sentence was a "clear message that officers who break their oaths by robbery, by fraud, by other crimes will be

prosecuted and will be justly punished for that conduct." *Id.* Further, Hersl has only served 37%

of that "significant" sentence. In cases involving guns or crimes of violence, courts are less likely

to grant compassionate release when the defendant has only served a fraction of their sentence.

*See Chambliss*, 948 F.3d at 694 (denying compassionate release to terminally-ill defendant

because, among other things, reducing the sentence by more than 50% "minimizes the impact of

[defendant's] crime and seriousness of the offense."); *Clark*, 2020 WL 1874140 (M.D.N.C. April

15, 2020) (denying compassionate release to terminally-ill, bedridden defendant where defendant

only served 40% of this 30-year sentence).

Under § 3553(a)(2)(C), the court must consider the need to protect the public from further

harm. Dangerousness is also a consideration when evaluating compassionate release motions. *See*

U.S.S.G. § 1B1.13(a)(2). Although Judge Blake did not find the need for specific deterrence and

did not find that the defendant was likely to recidivate, Hersl's post-judgment conduct indicates

that he may still be a danger to the community. Hersl used his badge and his gun to commit the

underlying offenses. He also continues to deny any responsibility for his conduct. Instead, he

blames the prosecutors, the FBI, the judiciary, and his attorney. This is not the kind of remorse or

rehabilitation that would give the Court comfort that the defendant is not a danger.

Under § 3553(a)(6), the court must avoid unwarranted sentencing disparities among

defendants who have been found guilty of similar conduct. Judge Blake was careful to craft a

sentence for the defendant that was consistent with other sentences in the GTTF case. Exhibit 1

at 82-83. The defense notes that defendants Gondo, Hendrix, and Ward have already been

released, but Judge Blake intentionally gave Hersl a longer sentence than those defendants. Judge

Blake intentionally gave Hersl the same 18-year sentence that she gave defendant Marcus Taylor,

who is not mentioned in Hersl's motion, and who is still incarcerated.

When courts evaluate the § 3553(a) factors for compassionate release, they often have the benefit of the passage of time and can learn whether a defendant has accepted responsibility for their conduct, shown remorse, repaid their victims, or engaged in any rehabilitative efforts. Courts often grant compassionate release for terminally-ill defendants when they have accepted responsibility, shown signs of rehabilitation, and repaid victims. *See United States v. Kelly*, 464 F. Supp. 3d 1134 (N.D. Ca. 2020) (granting compassionate release terminally-ill defendant who pleaded guilty, accepted responsibility, made significant rehabilitative efforts while incarcerated); *United States v. Karr*, 611 F. Supp. 3d 395 (E.D.K.Y. 2020) (granting compassionate release to terminally-ill defendant who "took immediate and full responsibility for his crime, accepting punishment while others sought to avoid accountability."); *United States v. Gargan*, 2022 WL 5101724 (E.D.V.A. Oct. 4, 2022) (compassionate release granted where defendant had repaid more than $1 million to victims).

When a defendant has not shown any signs of remorse or mitigation, courts have denied compassionate release, even when the defendant was terminally ill. *See Webster*, 611 F. Supp. 3d at 203 ("Defendant has presented no post-sentencing mitigation evidence that would rebut the significant amount of evidence that demonstrates his violent nature."); *Clark*, 2020 WL 1874140 at *1, *6 (court denied compassionate release to terminally-ill defendant who was "bedridden or ambulatory with an electric wheelchair" because defendant had presented "no post-sentencing mitigation evidence" and "nowhere . . . does he express remorse for his actions[.]"); *Clayton*, 2021 WL 2689838 at *3 (denying compassionate release to defendant with Stage IV terminal colorectal cancer where, among other things, defendant had a poor disciplinary record while incarcerated).

Here, there is no evidence of any rehabilitation by Hersl. He has opposed paying restitution to his victims. *See* ECF No. 746. He told the Court he had no disciplinary infractions when he

did.  Hersl has no remorse, and he does not accept responsibility for his actions.  Instead, he claims

he is a victim of "guilt by association," because he "unknowingly and involuntarily was assigned

to a corrupt and dangerous internal police criminal conspiracy[.]"  ECF No. 615 at 5.  He claims

that he was wrongly and unjustly convicted due to prosecutorial misconduct, ineffective assistance

of his counsel, and judicial interference.  *See* ECF No. 615.  Hersl's own filings have demonstrated

that his time in custody thus far has not been sufficient to meet the needs of sentencing under

§ 3553(a), and the Court should deny his motion.

## IV.    CONCLUSION

WHEREFORE, the United States requests that the Court DENY the defendant's Motion

for Compassionate Release.

Respectfully submitted,

Erek L. Barron
United States Attorney


_____/s/_____
Matthew P. Phelps
Assistant United States Attorney
U.S. Attorney's Office
District of Maryland
36 South Charles Street
Baltimore, Maryland 21201
(410) 209-4800
matthew.phelps@usdoj.gov